# United States Court of Appeals
# for the Eleventh Circuit

LLOYD EUGENE BAKER,

*Plaintiff-Appellee*,

v.

KIMBERLY O. BRANSCOME, JAY L. BHIMANI,

*Interested Parties-Appellants*.

On Appeal from an Oral Ruling and Related Written Order of the
United States District Court for the Northern District of Florida,
Case No. 7:20-cv-00039

## BRIEF FOR APPELLANTS KIMBERLY O. BRANSCOME AND JAY L. BHIMANI

MOORE, HILL & WESTMORELAND, P.A.
Larry Hill
Charles F. Beall, Jr.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola, FL 32502
(850) 434-3541

GIBSON, DUNN & CRUTCHER LLP
Kevin S. Rosen
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Thomas H. Dupree Jr.
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
(202) 955-8500

Nancy E. Hart
Timothy Sun
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000

*Attorneys for Kimberly O. Branscome and Jay L. Bhimani*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellants Kimberly O. Branscome and Jay L. Bhimani hereby state that the following individuals and entities have an interest in the outcome of this appeal:

- 3M Company (MMM) – defendant in underlying case (*Baker v. 3M Company et al.*, No. 7:20-cv-00039)

- Aearo Technologies LLC – defendant in underlying case

- Aylstock, Bryan Frederick – counsel for plaintiff in underlying case

- Aylstock Witkin Kreis & Overholtz – counsel for plaintiff in underlying case

- Baker, Lloyd Eugene – plaintiff in underlying case

- Beall, Charles Franklin Jr. – counsel for defendants in underlying case

- Bhimani, Jay L. – appellant / counsel for defendants in underlying case

- Branscome, Kimberly O. – appellant / counsel for defendants in underlying case

- Brock, Robert C. – counsel for defendants in underlying case

- Brown, Micah David – counsel for defendants in underlying case

- Buchanan, David R. – counsel for plaintiff in underlying case

- Castiglia, Craig – counsel for defendants in underlying case

- Ciresi Conlin LLP – counsel for plaintiff in underlying case

- Clark Love & Hutson PLLC – counsel for plaintiff in underlying case

- Decamp, Kyle Richard – counsel for defendants in underlying case

- Dechert LLP – counsel for defendants in underlying case

- Dupree Jr., Thomas H. – counsel for appellants Kimberly O. Branscome & Jay L. Bhimani

- Fields, Barry E. – counsel for defendants in underlying case

- Fox, Shawn – counsel for plaintiff in underlying case

- Hart, Nancy E. – counsel for appellants Kimberly O. Branscome & Jay L. Bhimani

- Hill, Thomas Larry – counsel for defendants in underlying case

- Hutson, Shelley Van Natter – counsel for plaintiff in underlying case

- Jones, Hon. Gary R. – U.S. Magistrate Judge for the Northern District of Florida

- Kelly, Maxwell H. – counsel for plaintiff in underlying case

- Kim, Mary H. – counsel for defendants in underlying case

- Kirkland & Ellis LLP – counsel for defendants in underlying case

- Marlowe, Emily B. – counsel for plaintiff in underlying case

- Moore Hill & Westmoreland PA – counsel for defendants in underlying case

- Nomellini, Mark J. – counsel for defendants in underlying case

- Odom, Megan L. – counsel for plaintiff in underlying case

- Ozurovich, Allison K. – counsel for defendants in underlying case

- Rodgers, Hon. M. Casey – U.S. District Judge for the Northern District of Florida

- Rosen, Kevin S. – counsel for appellants Kimberly O. Branscome & Jay L. Bhimani

- Sacchet, Michael A. – counsel for plaintiff in underlying case

- Seeger Weiss LLP – counsel for plaintiff in underlying case

- Seeley, Caleb A. – counsel for plaintiff in underlying case

- Sun, Timothy – counsel for appellants Kimberly O. Branscome & Jay L. Bhimani

- Tam, Jonathan S. – counsel for defendants in underlying case

- Tracey & Fox Law Firm – counsel for plaintiff in underlying case

- Tracey, Sean Patrick – counsel for plaintiff in underlying case

- VanFleteren, Haley J. – counsel for defendants in underlying case

- Wasdin, Nicholas F. – counsel for defendants in underlying case

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rule 28-1(c), Appellants Kimberly O. Branscome and Jay L. Bhimani request oral argument. This appeal raises important questions regarding a district court's power to sanction attorneys appearing before it, the procedural protections that should be provided, and the standard to be applied. Oral argument would substantially assist the Court in resolution of this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION.........................................................7

STATEMENT OF THE ISSUES...............................................................7

STATEMENT OF THE CASE....................................................................8

I.     The Underlying Litigation ...........................................................8

II.    The Testing Performed By Michael & Associates And Related
       Evidentiary Issues ........................................................................9

III.   The Michael's Testing Issue During The *Baker* Trial...................11

IV.    The District Court's "Make Clear" Requirement And Ms.
       Branscome's Closing Argument....................................................12

V.     The District Court, Without Warning, *Sua Sponte* Imposes Sanctions
       On Appellants ..............................................................................15

VI.    A "Hearing" Is Held Several Hours Later, Without Notice.............17

VII.   The District Court's Oral Ruling...................................................19

VIII.  The District Court's Subsequent Written Order.............................20

STANDARD OF REVIEW .....................................................................22

SUMMARY OF THE ARGUMENT .......................................................23

ARGUMENT ..........................................................................................26

I.     The District Court Erroneously Relied On Its Contempt Power To
       Impose The Nonexistent Remedy Of "Summary Sanctions" .........26

II.    Appellants Did Not Violate The Make Clear Requirement, Let Alone
       Do So In Bad Faith ......................................................................32

ii

A.   Ms. Branscome *Did* Make Clear To the Jury That They Could Not Consider Any Part Of The Michael's Testing For The Truth ................................................................................32

B.   The Court Made No Finding Of Subjective Bad Faith .......................39

III.   The District Court Failed To Afford Appellants Due Process ......................45

A.   The Court Failed To Give Appellants Notice Of Possible Sanctions, Notice Of A Hearing, Or A Meaningful Opportunity To Be Heard ........................................................................45

B.   The Court's "Make Clear" Requirement Was Too Vague To Support Sanctions.................................................................50

CONCLUSION ........................................................................53

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Devine*,
998 F.3d 1258 (11th Cir. 2021) ...............................................................28

*Am. Red Cross v. Palm Beach Blood Bank, Inc.*,
143 F.3d 1407 (11th Cir. 1998) .................................................................1

*Armstrong v. Manzo*,
380 U.S. 545 (1965)..................................................................................49

*Berenguela-Alvarado v. Castanos*,
950 F.3d 1353 (11th Cir. 2020) ...............................................................43

*Byrne v. Nezhat*,
261 F.3d 1075 (11th Cir. 2001) ...............................................................43

\* *Campos v. City of Naples*,
202 F. App'x 381 (11th Cir. 2006)............................................26, 28, 42, 49

\* *Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)..............................................................................27, 28

*Christensen v. Apfel*,
1999 WL 33595519 (M.D. Fla. Nov. 5, 1999)............................................45, 48

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971)..................................................................................51

*Collins v. Collins*,
481 P.3d 270 (Okla. Civ. App. 2019) .......................................................44

*Danubis Grp., LLC v. Landmark Am. Ins. Co.*,
685 F. App'x 792 (11th Cir. 2017).............................................................47

*Dashtpeyma v. Liberty Ins. Corp.*,
2012 WL 13012622 (N.D. Ga. July 10, 2012) ..........................................47

*Didie v. Howes*,
988 F.2d 1097 (11th Cir. 1993) ...............................................................43

iv

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)...............................................25, 50, 52

*F.T.C. v. AbbVie Prods. LLC*,
  713 F.3d 54 (11th Cir. 2013) .............................................23

*Fjelstad v. Am. Honda Motor Co.*,
  762 F.2d 1334 (9th Cir. 1985) ..........................................51

*Haji v. NCR Corp.*,
  834 F. App'x 562 (11th Cir. 2020) ..................................41

*Hyde v. Irish*,
  962 F.3d 1306 (11th Cir. 2020) ......................................40

* *Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994)..................................................*passim*

*Jove Eng'g, Inc. v. I.R.S.*,
  92 F.3d 1539 (11th Cir. 1996) ........................................29

*Kampitch v. Lach*,
  405 F. Supp. 2d 210 (D.R.I. 2005) ..................................44

*Kleiner v. First Nat. Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) ......................................29

* *Kornhauser v. Comm'r of Social Sec.*,
  685 F.3d 1254 (11th Cir. 2012) ..................27, 45, 46, 49

*Kovelesky v. First Data Corp.*,
  2012 WL 12949625 (S.D. Fla. Dec. 12, 2012), *aff'd*, 534 F. App'x
  811 (11th Cir. 2013)...................................................46

*Life Techs. Corp. v. Govindaraj*,
  931 F.3d 259 (4th Cir. 2019) ..........................................50

*Malautea v. Suzuki Motor Co.*,
  987 F.2d 1536 (11th Cir. 1993) ......................................50

*Martin v. Automobili Lamborghini Exclusive, Inc.*,
  307 F.3d 1332 (11th Cir. 2002) ..................................39, 41

*Mathews v. Eldridge*,
424 U.S. 319 (1976)............................................................45

\*    *Miller v. Midland Credit Mgmt.*,
2021 WL 4240972 (11th Cir. 2021) ........................6, 24, 39, 47

*Mitchel v. VegasSportsConsultants.com*,
2019 WL 3426038 (S.D. Fla. May 23, 2019)....................41

\*    *In re Mroz*,
65 F.3d 1567 (11th Cir. 1995) .......................................27, 45

*In re Porto*,
645 F.3d 1294 (11th Cir. 2011) ...........................................39

\*    *Pounders v. Watson*,
521 U.S. 982 (1997)......................................................21, 28, 30

\*    *Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017) ...................................*passim*

*Matter of Respondent Y*,
1998 WL 240126 (Cal. Bar Ct. May 5, 1998)....................44

*Reynolds v. Alabama Dept. of Transp.*,
10 F. Supp. 2d 1263 (M.D. Ala. 1998).................................48

*Roadway Exp., Inc. v. Piper*,
447 U.S. 752 (1980)................................................................39

*Rowe v. Gary*,
773 F. App'x 500 (11th Cir. 2019)........................................40

*Sciarretta v. Lincoln Nat. Life Ins. Co.*,
778 F.3d 1205 (11th Cir. 2015) ...........................................29

*Silva v. Pro Transport, Inc.*,
898 F.3d 1335 (11th Cir. 2018) ...........................................22

*Thompson v. C.R. Bard, Inc.*,
2020 WL 3052227 (S.D. Ga. June 8, 2020) ........................46

*United States v. Robertson*,
    493 F.3d 1322 (11th Cir. 2007) ...................................................23, 39

*United States v. Shaygan*,
    652 F.3d 1297 (11th Cir. 2011) ...........................................23, 45, 46

*Wimbush v. Georgia*,
    673 F. App'x 965 (11th Cir. 2016) ....................................................41

*Withrow v. Larkin*,
    421 U.S. 35 (1975) .............................................................................49

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
    2021 WL 1739293 (S.D. Fla. May 3, 2021) .....................................44

**Statutes**

Cal. Bus. & Prof. Code § 6068(o)(3) ......................................................44

**Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................7

Fed. R. Crim. P. 42(b) .............................................................................29

Rules of Procedure of the State Bar of Cal., Tit. IV, § 1.3 ....................44

Rules of Procedure of the State Bar of Cal., Tit. IV, § 1.8(c) ................44

# INTRODUCTION

This appeal concerns the district court's erroneous imposition of *sua sponte* sanctions on Appellants—two attorneys at Dechert LLP and counsel to the defendants in the trial below. Appellants sought to comply with a vague order issued by the court the morning of the last day of trial. They were nevertheless sanctioned for purportedly "willfully" violating the order, without any notice or a meaningful opportunity to be heard, and in clear contravention of governing law. The court abused its discretion and should be reversed.

The trial below was part of a multidistrict litigation ("MDL") concerning one model of defendant 3M Company's combat arms earplugs. The MDL plaintiffs allege they suffered hearing damage from using those earplugs, which they claim were defective. The third bellwether trial to take place in the MDL, *Baker v. 3M Company*, 7:20-cv-00039, gives rise to this appeal.[1]

A recurring issue across the three bellwether trials concerned the admissibility of a study performed by an independent laboratory, Michael & Associates, Inc., regarding the noise reduction rating—the "NRR"—of the earplugs at issue. The laboratory's testing (the "Michael's Testing") concluded that the NRR of the

---

[1] A fourth bellwether trial was completed during the pendency of this appeal, *see Adkins v. 3M Company et al.*, 7:20-cv-00012, but is not part of the appellate record.

earplugs is 23, reflecting a noise reduction efficacy higher than what the plaintiffs claimed.

The court ruled that the Michael's Testing was hearsay and could not be considered for its truth. However, the court determined that it could be raised in expert testimony and considered by the jury in evaluating expert credibility and whether the expert had relied on the Michael's Testing. Accordingly, the Michael's Testing was raised in the context of expert testimony in each of the three bellwether trials, and the court issued numerous instructions to the juries explaining the hearsay nature of that evidence and its limited permissible use. The court's rulings and instructions did not distinguish between the Michael's Testing generally and its specific conclusion that the earplugs had an NRR of 23—indeed, none of those instructions mentioned the NRR at all. Instead, the court referred to the Michael's Testing and all its component parts—the study itself, its data, its conclusion, its lab manual—interchangeably.

With this understanding of the issue, Appellants sought to use a presentation slide during their closing argument in *Baker* that included information from the Michael's Testing. The slide was situated within the portion of the closing presentation attacking the credibility and consistency of plaintiff's experts' opinions. As such, when the court stated during a morning conference on the day of closing arguments that Appellants were to "make[] that clear" to the jury that the closing

slide "is not being offered for the truth that the NRR was 23," Appellants believed they understood the order.  Doc. 204-10 at 4:20-23.[2]

Consistent with that order, Appellant Kimberly O. Branscome—the attorney delivering the closing, who had been informed of the court's morning order by her colleague, Appellant Jay L. Bhimani—used the slide during her attack on the credibility and consistency of plaintiff's expert's analysis.  After Ms. Branscome had moved off the slide, the court called Ms. Branscome to a sidebar *sua sponte*, apparently concerned that it had not been made sufficiently clear to the jury that the contents of the slide could not be considered for the truth.  The court then told Ms. Branscome that she had to "clear this up to my satisfaction."  *Id.* at 101:18-20.  Ms. Branscome then explained to the jury that the Michael's Testing was hearsay and could only be considered in evaluating expert credibility.  *Id.* at 102:13-103:3.  At no point during Ms. Branscome's closing did plaintiff's counsel object to her use of the slide or her explanation of the hearsay issue.  After her explanation, the court told the jury that Ms. Branscome was "absolutely correct in the way she's described that to you."  *Id.* at 103:4-7.

It was a shock, then, when after the jury had retired to deliberate, the court suddenly *sua sponte* sanctioned Appellants for purportedly "willful[ly]" violating its

---

[2] Citations in the form "Doc. X at Y" refer to the district court docket entry X at page Y in *Baker*.  Citations to particular pages reference the CM/ECF page number at the top of the page.

"make clear" requirement. *Id.* at 159:8-12. After saying that it would "perhaps" allow Appellants to respond at some hypothetical time, *id.* at 159:24, the court several hours later summoned the parties back to the courtroom and, without prior notice, demanded that Appellants argue on the spot "why sanctions shouldn't be imposed for what happened this morning," *id.* at 162:2-14. Having been provided no notice, Appellants made their case as best they could in the roughly ten minutes the court afforded them, explaining that the "make clear" requirement had been conveyed by Mr. Bhimani to Ms. Branscome; that Ms. Branscome used the slide only as an attack on the credibility of Plaintiff's expert; and that she explicitly told the jury that evidence from the study displayed on the closing slide was hearsay and could not be considered for the truth. Appellants repeatedly stated that they had intended to abide by the "make clear" requirement.

It became clear only then that the court was singularly focused on whether Appellants had told the jury that the *NRR figure of 23*—as opposed to the *Michael's Testing generally*—could not be considered for the truth. Appellants responded that in their mind, there was no distinction between the Michael's Testing and its NRR conclusion for purposes of explaining the hearsay issue to the jury. But because there had been no notice of a hearing, Appellants had no opportunity to address the court's distinction by pointing to evidence of every other ruling and instruction on

this issue across the three trials to show that their understanding of the court's "make clear" statement was consistent with those prior pronouncements.

The court rejected Appellants' explanations, reiterated its conclusion that they had "willful[ly]" violated its order, and imposed sanctions of $10,000 against Ms. Branscome and $2,000 against Mr. Bhimani, payable to the court. *Id.* at 178:16-179:1. It "further memorialize[d]" its findings in a written order issued four days later. Doc. 187 at 1.

These sanctions were legally erroneous, factually baseless, and unconstitutional. The court imposed sanctions by purporting to rely on its "summary sanction" power. *See id.* at 4-5. But there is no such thing as a "summary sanction" under the law, and the court's reliance on caselaw addressing a court's summary *contempt* power is irrelevant to the proceedings here. Not only did the court not make any contempt finding, there were no exigent circumstances that could even justify a "summary" contempt order.

In any event, Appellants *did not* violate the "make clear" requirement. Mr. Bhimani conveyed the order to Ms. Branscome, and Ms. Branscome used the slide only to challenge the credibility and consistency of plaintiff's expert. In addition, Ms. Branscome explained to the jury, as the court had instructed, that it could not consider the Michael's Testing for the truth.

Even if the court construed Appellants' actions as violating the "make clear" requirement, there is *zero* evidence of *subjective* bad faith, as this Court requires. *See Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223-24 (11th Cir. 2017). Indeed, the court did not even "mention bad faith or cite the bad-faith standard." *Miller v. Midland Credit Mgmt.*, 2021 WL 4240972, at \*3 (11th Cir. Sept. 17, 2021). Instead, the court applied an erroneous, *objective* test, insisting that no "reasonable" person could have understood its "make clear" requirement any differently than the court did.

Finally, the sanctions must be reversed because the court deprived Appellants of due process. It provided no warning of the possibility of sanctions until it was actually *imposing* sanctions; effectively declared that a hearing would be useless, stating that it would "perhaps" hear from Appellants but that it did not "need to hear from you about the facts"; provided no notice of the surprise "hearing" that was later held; and prejudged the entire matter by having declared earlier that "there will be sanctions" and "there's nothing you can do to ameliorate it."

At worst, this was a misunderstanding over a vague directive. Sanctions were not warranted, and the district court's order imposing such sanctions here should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying *Baker* case pursuant to 28 U.S.C. § 1332. After a jury verdict for plaintiff, the court entered final judgment on June 21, 2021. Doc. 186. The court signed an amended judgment on July 19, 2021, "*nunc pro tunc* the date of the original judgment." Doc. 197. The court sanctioned Appellants in an oral ruling on the last day of trial, June 18, 2021, and entered a subsequent written order "further memorializ[ing] the Court's findings and the imposition of sanctions" on June 22, 2021. Doc. 187. On July 15, 2021, Appellants timely noticed an appeal of the June 18, 2021 oral order and June 22, 2021 written order. Doc. 193; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Did the district court err by imposing "summary" sanctions on Appellants, where it lacked authority to do so and relied on its summary *contempt* power, despite making no "contempt" finding and where no exigent circumstances existed?

2. Did the district court err in imposing sanctions where Appellants satisfied the "make clear" requirement by making clear to the jury that it could not consider the Michael's Testing—which necessarily includes its NRR conclusion—for the truth; where the court failed to make a specific finding of subjective bad faith

and instead referred to what a "reasonable lawyer" would have understood; and where there is no evidence of subjective bad faith?

3.     Did the district court erroneously deny Appellants due process when it imposed sanctions based on an order too vague to support sanctions, failed to provide notice of possible sanctions, failed to provide notice of a hearing, abruptly demanded Appellants argue their position without providing adequate time to prepare their case, and prejudged its conclusion of "willful" disobedience?

## STATEMENT OF THE CASE

### I.     The Underlying Litigation

Appellants Branscome and Bhimani are attorneys at Dechert LLP and counsel for defendants 3M Company and Aearo Technologies LLC in the underlying MDL. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 3:19-md-2885 (N.D. Fla.). Before the *Baker* trial, from which this appeal arises, two other bellwether trials took place in the MDL.  The first was a consolidated trial of three cases, *Estes v. 3M Company*, 7:20-cv-137, *Hacker v. 3M Company*, 7:20-cv-131, and *Keefer v. 3M Company*, 7:20-cv-104 (collectively, "*EHK*").  The second trial was *McCombs v. 3M Company*, 7:20-cv-0094 ("*McCombs*").   Judge M. Casey Rodgers of the Northern District of Florida presided over all three trials and continues to preside over the MDL.

## II.     The Testing Performed By Michael & Associates And Related Evidentiary Issues

A "hotly contested" piece of evidence across all three bellwether trials was the Michael's Testing.  Doc. 187 at 1.  The purpose of this testing was to measure the efficacy of the earplugs, which the testing determined to have an NRR of 23, reflecting a higher noise reduction value than what the plaintiffs alleged.  *Id.*; Doc. 204-4 at 16:9-12; Doc. 204-10 at 55:2-6, 99:23-25; Doc. 118 at 1.

During the first trial (*EHK*), the court ruled that an exhibit regarding the Michael's Testing was not admissible.  *See* A-52-A-55 at 3:6-6:15.[3]  However, the court explained that it would not "exclude [the Michael's Testing] from expert testimony."  A-52-A-53 at 3:15-16, 3:25-4:1.  Although "[t]he study" was not admissible into evidence, expert witnesses could be questioned about the study, including on cross-examination, and the jury "can evaluate [the expert's] opinion and the fact that he relied on a study or didn't rely on a study."  A-54-A-55 at 5:24-6:6.  The court said it would instruct the jury "***that they can't consider the truth of the study.***  They ***cannot consider the truth of the facts asserted in that study***, and that's the same with all of the expert reliance material."  A-54 at 5:17-20 (emphases added).

---

[3]   References to the transcripts contained in pages A-34 to A-82 in the Addendum are excerpts of the transcripts attached as Exhibits A and B to Appellants' Motion to Supplement the Record, which was granted by this Court on October 19, 2021.

The following week, the court ruled on a motion in limine in *Baker*, holding that evidence regarding the Michael's Testing was inadmissible hearsay, but that, consistent with its rulings in *EHK*, the parties could question expert witnesses regarding the bases for their opinions using the Michael's Testing. *See* Doc. 118 at 1, 3 ("the [Michael's] ***Test Reports*** are hearsay" and "inadmissible," but "the parties remain free to examine or cross-examine expert witnesses regarding the bases for their opinions using the [Michael's] Test Reports" (emphasis added)). The court then applied that same ruling in *McCombs*. *See* A-65-A-66 at 7:15-8:8 ("I said in my order in *Baker* that [the Michael's Testing] could be discussed with an expert. I'll give the jury an instruction that it can't be considered for the truth.").

The Michael's Testing was raised during witness examinations in both *EHK* and *McCombs*. The court instructed the jury as to the hearsay nature of that testing and its limited use in evaluating expert testimony. *See infra* 36-38.

Throughout these rulings and instructions, the court never made any distinction between the Michael's Testing generally and the specific NRR 23 figure that was the result of that testing. Indeed, the NRR figure was never specifically mentioned in the instructions at all. Instead, the testing and its results were discussed interchangeably—the Michael's Testing as a whole was treated as hearsay. *See id.*

### III. The Michael's Testing Issue During The *Baker* Trial

The Michael's Testing came up several times during the *Baker* trial, and here too, the court instructed the jury without reference to the NRR of 23. For example, on direct examination, plaintiff's expert, Richard McKinley, mentioned the Michael's Testing in response to a question about whether he was aware of other labeling tests. Doc. 204-2 at 179:22-180:3. Plaintiff's counsel replied, "we'll come back to that," but the topic was not discussed again. *Id.* at 180:10.

On cross-examination, Ms. Branscome questioned Mr. McKinley about the Michael's Testing, including specifically that it had reported an NRR of 23. The court instructed the jury, "[A]s far as the ***Michael's test report and the results of the report, the report is hearsay*** . . . . So you cannot consider it for the truth of the matter asserted in the—with regard to the results in the report, but you can consider it in your evaluation of Mr. McKinley's opinions and regarding whether he did or didn't rely on it." *Id.* at 286:10-288:13 (emphasis added).

Later, during the same line of questioning when the Michael's Testing data chart showing the NRR of 23 was being pulled up to be displayed to the jury, the court reiterated, "do remember that this is hearsay. You ***may not consider this study for the truth of the matter asserted in the study,*** but you can consider it in your evaluation of Mr. McKinley's opinion." Doc. 204-4 at 14:13-16 (emphasis added).

When the defense expert, Dr. Casali, addressed the Michael's Testing, the court again instructed the jury, "[W]ith regard to Dr. Casali's testimony now and going forward this morning regarding the *Michael study, the Michael lab standards, and the test results, that is all hearsay*. You cannot consider it for the truth of *that study or anything about the Michael's lab manual*. However, you can consider, in evaluating Dr. Casali's opinion, that he relied on those materials and his explanation for why he relied on those materials." Doc. 204-8 at 67:8-15 (emphasis added).

During examination of another defense expert, Dr. Mark Stephenson, the court instructed, "you'll remember I've given you this instruction, but *the Michael's testing data and testing results* are hearsay. You may not consider this testimony for its truth. You can consider it in your evaluation of Dr. Stephenson's opinion, the fact that he relied on it." Doc. 204-9 at 249:5-11 (emphasis added).

## IV. The District Court's "Make Clear" Requirement And Ms. Branscome's Closing Argument

On the day of closing arguments, Mr. Bhimani attended an early-morning conference with the court and plaintiff's counsel to discuss closing argument slides. *See* Doc. 204-10 at 4:10-11, 165:11-18. Ms. Branscome did not attend the conference. *Id.* at 165:14-21.

At the conference, the court addressed plaintiff's objection to a defense slide relating to the Michael's Testing. The slide was located in a section of the closing presentation attacking the credibility and consistency of plaintiff's witnesses. *See*

12

Doc. 189-2 at 19-21. On one side of the slide was an excerpt of Mr. McKinley's direct testimony where he mentioned the Michael's Testing and plaintiff's counsel's comment that "we'll come back to that." *Id.* at 21. The other side of the slide had a chart from the Michael's Testing with text underneath saying "The NRR is 23." *Id.*; *see also* Doc. 204-10 at 4:5, 4:14-15.

Mr. Bhimani explained that the chart had been shown to the jury, and that its purpose was to highlight "[t]he dichotomy . . . between direct [examination] and cross." Doc. 204-10 at 4:14-16. He also noted that the court had previously instructed the jury that "this document was not coming in for the truth but it may be considered for its impact on Mr. McKinley's opinion." *Id.* at 4:16-19.

The court responded, "Here's the deal: If Ms. Branscome ***makes that clear*** in her closing that this is not being offered for the truth that the NRR was 23, then I'm fine with it. If not, it's not coming in." *Id.* at 4:20-23 (the "Make Clear Requirement") (emphasis added). That was the entirety of the court's instruction.

Mr. Bhimani informed Ms. Branscome of the court's instruction. *See id.* at 156:3-7, 168:17-21; *see also id.* at 156:20-25. When Ms. Branscome discussed the slide, she argued to the jury that plaintiff's expert had not been consistent, pointing out that the expert had not discussed the Michael's Testing until it was brought out on cross-examination because it was "inconsistent with his opinion." *Id.* at 99:12-101:2.

13

The court then called Ms. Branscome to a sidebar even though plaintiff had not objected to any of the foregoing. The court asked Ms. Branscome whether Mr. Bhimani had relayed its instructions to her. Ms. Branscome said Mr. Bhimani had told her she "needed to frame it in terms of the reliance on it, which is why this is all in the context of Mr. McKinley." *Id.* at 101:7-12. The court replied,

> I told him you had to tell the jury they could not consider this for the truth. . . . You, in talking about it in terms of the truth, you said they had an NRR of 23. You didn't connect that to Mr. McKinley. The slide is up there, but you're also talking—so you're going to have to clear this up to my satisfaction or I'm going to clear it up. They need to know they cannot consider the 23 for the truth of the results of that test.

*Id.* at 101:13-22. Ms. Branscome replied that her discussion of the slide was in the context of credibility, but if it had not been clear she would "clear it up." *Id.* at 101:23-25. Ms. Branscome then addressed the jury:

> You heard from Judge Rodgers that the testing from Michael & Associates falls into a unique evidence category; it's called hearsay. And what that means is you can consider it not for the truth of the testing but for the credibility that it has to the plaintiff's case on whether their experts relied on it, whether they told you about it. And then you can do the same with our case and did our experts, were they reasonable in relying on it in coming to their ultimate conclusions. And so, how does that fit in the framework if you're evaluating Mr. McKinley? It comes into play if you ask yourself, if he reached the opinion that the [earplug] was defective but he didn't tell you about evidence that's contrary to that opinion, does that call into question the basis for his conclusion.

*Id.* at 102:12-103:3. The court then told the jury, "Ms. Branscome is absolutely correct in the way she's described that to you, but I want to make sure you

14

understand. You may not consider the NRR of 23 on the Michael study for the truth." *Id.* at 103:4-7. Ms. Branscome completed her closing and the jury adjourned to deliberate.

## V. The District Court, Without Warning, *Sua Sponte* Imposes Sanctions On Appellants

After the jury was excused, the court asked Mr. Bhimani if he had told Ms. Branscome about its morning order. *Id.* at 155:25-156:2. Mr. Bhimani replied that he had conveyed his understanding that "the closing argument should make clear that it's being offered in the context of challenging the credibility of the witness." *Id.* at 156:3-12. The court then asked Ms. Branscome, "Were you ever told by Mr. Bhimani that . . . you had to tell the jury that this NRR of 23 was not being offered for the truth[?]" *Id.* at 157:1-4. Ms. Branscome replied that she did not remember the exact words used, but that her understanding was "that the jury needed to understand this was being done as an attack on Mr. McKinley's credibility." *Id.* at 157:9-14. Ms. Branscome further clarified that after hearing the real-time transcript of the morning conference read out loud by the court earlier in the colloquy, she would have had the same understanding of the ruling. *Id.* at 157:18-20. The court replied, "Disagree. Disagree." *Id.* at 157:21.

The court added, "I had to call you up to the bench . . . . It wasn't made clear, in my opinion, again. You never said that it wasn't offered for the truth, that the

NRR of 23 was not offered for the truth, so then I had to tell the jury that it wasn't." *Id.* at 158:12-17.

The court then stated that although its "clarification" was sufficient to "ameliorate" any "misleading impression that may have been left with the jury about the truth of the Michael's NRR of 23," it did not cure the "willful violation of my order." *Id.* at 159:5-10. And thus, "***there will be sanctions***, most likely in the form of monetary sanctions." *Id.* at 159:11-12 (emphasis added). This was the first time that sanctions over the Make Clear Requirement had ever been mentioned.

The court rejected the need for a hearing, saying, "***I know the facts. I don't need to hear from you about the facts***." *Id.* at 159:13-23. The court said Appellants *might* be heard at some future unspecified time: "I will ***perhaps*** hear from you later about this . . . . ***[I]f*** I decide that I want to hear from you, I'll give you that opportunity." *Id.* at 159:24-160:7. The court then reiterated that not making "clear to the jury" that "the NRR of 23" was "not to be offered for the truth, is a violation of my order . . . and frankly, ***there's nothing you can do to ameliorate it***." *Id.* at 160:20-161:3 (all emphases added).

When Ms. Branscome protested that this was "not a willful violation," the court said, "Yes, it was," then cut Ms. Branscome off, saying "Oh, I'm done. . . . We're in recess awaiting the jury's verdict." *Id.* at 161:10-25.

16

## VI.    A "Hearing" Is Held Several Hours Later, Without Notice

Recess was taken from 12:23 PM to 7:40 PM.  *Id.* at 162:1.  When counsel was called back to the courtroom, the court without prior warning asked to "hear from Ms. Branscome and Mr. Bhimani . . . on why sanctions shouldn't be imposed for what happened this morning."  *Id.* at 162:2-14.

Without having received notice that the court would hold a hearing on sanctions at this time, Appellants were not expecting to have to present a defense.  Ms. Branscome noted, "I apologize, I don't have my materials with me.  I thought we were hearing from the jury."  *Id.* at 162:16-18.

Ms. Branscome nonetheless explained that she had reviewed the transcript from the morning conference and the trial, and that she believed that Mr. Bhimani communicated what the court conveyed.  *Id.* at 162:19-23.  She stated that her discussion of the slide was in a section attacking the credibility of Mr. McKinley; that the slide was specifically about the gaps in Mr. McKinley's testimony regarding the Michael's Testing on direct versus cross-examination; and that it was her "intention of making clear" that her use of the Michael's Testing was a "credibility attack on Mr. McKinley."  *Id.* at 163:7-24.  Ms. Branscome also explained that at sidebar, "I understood that your Honor wanted me to make it more explicitly clear," which is why she went back to the jury to "articulate that that evidence was hearsay, meaning that it was not to be considered for the truth of the evidence but rather the

role that it played in Mr. McKinley's expert opinions and . . . with respect to Mr. McKinley's credibility. And so, I can only just say, Your Honor, I certainly intended to abide by the order." *Id.* at 163:25-164:11.

The court interjected, "What's not being used for the truth?" and Ms. Branscome replied, "The Michael testing." The court responded, "No, no. It was the NRR of 23." When Ms. Branscome replied, "I'm afraid, Your Honor, I don't see the distinction there," the court told her to "finish up" because it needed to hear from Mr. Bhimani. *Id.* at 164:17-25. Ms. Branscome then noted that "a willful violation . . . involves intent," and that "[e]verything I said to the jury is consistent with the examinations that have occurred during the trial." *Id.* at 166:4-9.

The court then turned to Mr. Bhimani, asking him what "wasn't being offered for the truth?" *Id.* at 167:17-19. He explained that, like Ms. Branscome, he did not understand there to be any distinction between the Michael's Testing generally and the specific NRR number. *See id.* at 167:12-24 ("I would include [the NRR of 23] within the exhibit and the data within the exhibit."). The court reiterated that the NRR was its sole focus and that it could not "believe that anyone that was present in this courtroom at that time would have thought anything differently." *Id.* at 167:22-168:16. Mr. Bhimani reiterated that "Your Honor did say to make it clear to the jury, which, in my understanding, meant we could not convey to the jury that this was offered for the truth." *Id.* at 169:5-10.

The court replied, "That is not what I said," and proceeded to read into the record her "findings." *Id.* at 169:11-179:4.

## VII. The District Court's Oral Ruling

As part of the court's "findings," the court stated that its "concern was focused on the language that the NRR is 23," and again asserted that "I don't think anyone in the courtroom would have misunderstood this." *Id.* at 171:14-16.

Citing for the first time two portions of Ms. Branscome's closing argument, the court found that Ms. Branscome violated the Make Clear Requirement and "the motion in limine ruling" because she had offered the NRR of 23 for its truth. *Id.* at 173:16-174:16. The court stated its "directive" at sidebar "allowed no room for interpretation," and that, accordingly, Ms. Branscome "had to tell the jury that they could not consider the NRR of 23 as true." *Id.* at 175:8-21; *see also id.* at 174:17-22. The court then said "it [didn't] matter to me how you conveyed it," and in fact Ms. Branscome could have done any of "[giving] an instruction," "remind[ing] them of my instruction," or saying "I'm not arguing on behalf of 3M the results of this NRR as 23 for the truth." *Id.* at 176:6-10.

The court found Ms. Branscome had failed to do so because she instead told the jury that "the Michael's testing—not testing results, just the testing—you didn't use the word 'result' and you definitely did not mention the NRR—could not be considered for the truth." *Id.* at 176:11-15. The court concluded, "there is no

reasonable lawyer who could have construed [its orders] in any way other than as a specific directive to advise the jury . . . that you were not arguing that the NRR of 23 was true." *Id.* at 177:9-17.

The court reiterated that Appellants' actions were a "willful" "contravention of a clear court order," and ordered Ms. Branscome and Mr. Bhimani to pay $10,000 and $2,000 to the court, respectively. *Id.* at 177:23-179:4.

Ms. Branscome then attempted once more to explain that she "never understood the distinction of the NRR equals 23 as being separate from the Michael's testing," and that she "genuinely thought" she had done "exactly what you asked me to do" in clarifying that the Michael's Testing could not be considered for the truth. *Id.* at 179:7-23, 180:12-22. The court again cut her off, insisting that "I couldn't have been more clear," and ended the colloquy. *Id.* at 180:23-182:4. The jury returned a verdict for plaintiff later that day. *See id.* at 185:3-187:13.

## VIII. The District Court's Subsequent Written Order

Four days after the June 18 close of trial, the court issued a written order "further memorializ[ing]" its "findings and the imposition of sanctions." Doc. 187. It noted that the Michael's Testing issue had been litigated across the three bellwether trials, and that "consistent with rulings on the matter in the prior trials, the parties [in *Baker*] were permitted to use the Michael's test reports in examining experts on the bases for the opinions about the [earplugs]." *Id.* at 1-2.

The court then found that "Ms. Branscome violated [the Make Clear Requirement] three times, one of which also violated the Court's ruling on the related motion in limine." *Id.* at 3. The court stated that, first, Ms. Branscome "offered the Michael's testing and its results . . . for truth," citing statements from Ms. Branscome's closing that had never been brought to Appellants' attention as violative of anything until *after* the sanctions "hearing" had ended. *Id.* at 3 & n.2; *infra* 50 n.9. Second, Ms. Branscome "did not immediately explain to the jury that they could not 'consider the NRR of 23 for the truth.'" Doc. 187 at 3-4. Third, despite the court "specifically and unequivocally reiterat[ing] its earlier ruling that 3M had to tell the jury that 'they cannot consider the 23 for the truth,'" Ms. Branscome failed to "mention the one statement with which the Court was concerned during the bench conference and the morning attorney conference—i.e., 'The NRR is 23[']—which had already been the subject of multiple rulings and jury instructions." *Id.* at 4.

The court then cited legal authority purporting to justify its "[s]ummary adjudication of misconduct involving the violation of court orders." *Id.* at 4-5 (citing *Pounders v. Watson*, 521 U.S. 982 (1997) and *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)).

The court justified its "summary sanction" by stating that the "conditions" it had imposed on use of the slide—i.e., the Make Clear Requirement—"were clear

and unequivoca[l]." *Id.* at 5. The court asserted that "[e]very ruling and jury instruction on the issue, whether in a written order or issued orally from the bench and memorialized in the trial transcript, was categorically and unambiguously directed at ensuring the jury understood it was prohibited from considering the Michael's conclusion that the NRR equaled 23 for its truth." *Id.* at 5-6.[4] Even though the trial had concluded by the time it issued sanctions, the court claimed that unless it took an "essentially immediate step to deter counsels' willful disregard" of its rulings, "this extraordinarily complicated trial, and the broader multidistrict litigation, risked becoming unmanageable," and that "[a]ny number of the multitude of attorneys involved in this litigation . . . may feel free to defy the Court." *Id.* at 7.

As to Appellants' supposed "willful[ness]," the court noted only both attorneys' "knowledge and experience," their access to the real-time transcript of the morning conference, their ability to seek "clarification of the Court's ruling," and the "specificity and unequivocality of the Court's rulings." *Id.* at 6-7.

## STANDARD OF REVIEW

This Court reviews a sanctions order for abuse of discretion. *Silva v. Pro Transp., Inc.*, 898 F.3d 1335, 1338 (11th Cir. 2018). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable

---

[4] As discussed *infra* 35-38, in fact, none of the prior jury instructions had ever specifically referred to the NRR.

or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 61 (11th Cir. 2013). A factual finding is clearly erroneous if it is not "supported by substantial evidence." *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007). An "argument that the sanctions imposed by the district court violated due process" is reviewed *de novo*. *United States v. Shaygan*, 652 F.3d 1297, 1310 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

**I.** The district court erroneously invoked its summary *contempt* power to impose "summary sanctions"—a remedy that does not exist under the law. The court mistakenly relied on authorities addressing a court's entirely separate power of finding *contempt of court* through "summary" proceedings—that is, expedited contempt proceedings that, due to exigent circumstances, may abridge the due process protections that are customarily afforded before contempt can be imposed. *See* Doc. 187 at 4-5.

But the court's *summary contempt* powers have no application here. The kind of extreme circumstances warranting summary proceedings were absent—there was no breakdown in order or "actual obstruction of justice," and the jury had retired to deliberate by the time sanctions were issued. *Bagwell*, 512 U.S. at 832. Indeed, the

court made no finding at all of "contempt," which is distinct from the inherent-power sanctions that it did impose.

**II.** Appellants did not violate the Make Clear Requirement. After Mr. Bhimani conveyed the court's order to Ms. Branscome, she used the Michael's Testing slide to attack the credibility and consistency of Plaintiffs' expert—exactly what the court's rulings on the Michael's Testing issue allowed and consistent with the Make Clear Requirement. Ms. Branscome explained to the jury that the "testing from Michael & Associates" was hearsay and could not be considered for its truth. That explanation necessarily included the NRR figure, which is the very conclusion of the "testing from Michael & Associates." The numerous instructions on the issue in *Baker* and the two previous trials all referred to the Michael's Testing and its component parts—including its results—interchangeably, ***with no specific mention of the NRR***.

Moreover, the court made no finding that Appellants acted with *subjective bad faith*, as is required for the imposition of sanctions under the court's inherent authority. *Purchasing Power*, 851 F.3d at 1223. The court failed even to "mention bad faith or cite the bad-faith standard." *Miller*, 2021 WL 4240972, at *3. Although the court concluded that Appellants had "willful[ly]" violated the Make Clear Requirement, it reached that conclusion not by examining their *subjective* bad faith, but by applying an erroneous *objective* standard, insisting that no "reasonable"

lawyer could have understood the Make Clear Requirement as Appellants had. Moreover, in light of the court's treatment of the Michael's Testing issue over the course of the three trials, Appellants had a good-faith belief that using the slide to attack expert credibility and explaining to the jury that the Michael's Testing could not be considered for the truth satisfied the Make Clear Requirement.

**III.** The court did not afford Appellants due process before imposing inherent-power sanctions. It failed to provide notice of possible sanctions or notice of a hearing, and failed to afford a meaningful opportunity to be heard. The first time that Appellants were warned that their conduct could result in sanctions was when they were actually *being* sanctioned. Previously, the court had told Appellants that it would "perhaps" hear from them, and declared that, in any event, "nothing" they said could "ameliorate" what the court had already decided was a "willful" violation of its Make Clear Requirement. Doc. 204-10 at 159:24, 161:2-3, 161:10-11. Several hours later, the court suddenly demanded, without warning, that Appellants present their defense, depriving them of adequate time and opportunity to prepare that defense.

The court also violated Appellants' due process rights by sanctioning them for purportedly violating an order that was too vague to "give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Although Appellants did "make[] . . . clear" to the jury that they could not

consider the Michael's Testing—which necessarily included its NRR result—for the truth, insofar as the court insisted that its Make Clear Requirement could be satisfied *only* by uttering the magic words "the NRR of 23 cannot be considered for the truth," the order was too vague to justify sanctions based on that omission. While the court insisted that its "make clear" requirement instructed Ms. Branscome that she "*must* tell the jury that they could not consider [] the reported NRR of 23 for the truth," no such explicit directive was given in the Make Clear Requirement or at sidebar. Doc. 187 at 6.

## ARGUMENT

## I. The District Court Erroneously Relied On Its Contempt Power To Impose The Nonexistent Remedy Of "Summary Sanctions"

A sanctioning court must "specify upon what authority it relies," and will be reversed on appeal if it "applies an incorrect legal standard [or] follows improper procedures in making the determination." *Campos v. City of Naples*, 202 F. App'x 381, 386 (11th Cir. 2006). "[T]he propriety of [sanctions]" depends on the legal authority relied upon for imposing sanctions—for example, "the scope of the court's authority" could differ if imposing sanctions "under [a] statute" or under its "inherent power to sanction." *Id.*

Here, although the district court referred to its "inherent authority" to impose sanctions, Doc. 187 at 4, the "authority" on which "it relie[d]" was inapposite. *Campos*, 202 F. App'x at 386. The court never once cited any of the legal

standards governing inherent-power sanctions; did not cite any of the controlling case law applying those standards; and did not make any of the findings this Court requires before inherent-power sanctions may be imposed.

The Supreme Court has warned courts that "inherent powers must be exercised with restraint and discretion," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), but the court never noted any such constraint, or the requirement that inherent-power sanctions may issue *only* upon a finding of "subjective bad-faith" or evidence of conduct "so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1223-25. The Supreme Court and this Court have also held that courts exercising their inherent sanctioning power "*must* afford the sanctioned party due process . . . in determining that the requisite bad faith exists." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (citing *Chambers*, 501 U.S. at 49) (emphasis added); *see also Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012).

Rather than abide by—or even acknowledge—any of these standards for inherent-power sanctions, the court instead purported to take what it called the "significant, essentially immediate step" of imposing "*[s]ummary sanctions*," Doc. 187 at 7 (all emphases added), repeatedly asserting its "responsibility to *summarily* punish misconduct," *id.* at 4, to undertake a "*summary adjudication*," *id.* at 5, and to reach "*summary disposition*," *id.* at 7—all *in lieu of* normal due process

protections. But there is no such thing as "summary sanctions" under the law, and the court's reliance on its inapposite summary *contempt* power to justify that nonexistent remedy (and concomitant denial of due process) was legal error requiring reversal. *See Campos*, 202 F. App'x at 386 (reversal warranted where district court "applies an incorrect legal standard" or "follows improper procedures in making the determination").

The district court cited only two cases to justify its actions. *See* Doc. 187 at 4-5 (citing *Pounders v. Watson*, 521 U.S. 982 (1997) and *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)). But *Pounders* and *Bagwell* did not address a court's inherent sanctioning power at all. Rather, they addressed the courts' authority to find litigants or attorneys in *contempt of court* through "summary" proceedings—that is, expedited contempt proceedings exempt from "normal due process requirements" such as "notice and a hearing." *Pounders*, 521 U.S. at 988-89 (affirming contempt sanction issued pursuant to state statute); *Bagwell*, 512 U.S. at 832 (reversing imposition of criminal contempt fines).

But *contempt* and inherent-power *sanctions* are distinct species of redress for perceived disobedience. Inherent sanctions are specifically directed at "vindicat[ing] judicial authority *without resort to the more drastic sanctions available for contempt of court*." *Chambers*, 501 U.S. at 46 (emphasis added); *see also Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1268 n.8

(11th Cir. 2021) ("[S]anctions imposed for contempt of court are not the same thing as sanctions imposed under the court's inherent power to police against bad faith conduct before it." (alterations omitted)); *Sciarretta v. Lincoln Nat. Life Ins. Co.*, 778 F.3d 1205, 1213 n.7 (11th Cir. 2015) (same). Here, the only time the word "contempt" appears in either the hearing transcript or the court's written order is where, at the hearing, the court expressly *distinguished* the sanction it was imposing from "criminal contempt." *See* Doc. 204-10 at 169:16-170:2.[5]

Summary contempt proceedings are governed by Rule 42(b) of the Federal Rules of Criminal Procedure and nearly always involve criminal contempt—a punishment not at issue here and that the court never purported to impose. *See* Fed. R. Crim. P. 42(b) (providing courts with the power of "summary disposition" to "summarily punish a person who commits criminal contempt in its presence if the

---

[5] Criminal contempt is punitive in nature and is generally imposed only through criminal proceedings with the right to a jury trial. *Bagwell*, 512 U.S. at 821. The court made no criminal contempt findings; nor did it file a "contempt order." *See* Fed. R. Crim. P. 42(b). This Court has "consistent[ly] reject[ed]" the notion that the punitive character of a monetary sanction "fixes" the proceeding as one for criminal contempt, as opposed to inherent power sanctions. *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985). Nor can the court's order be construed as civil contempt, which requires the sanction to "compensate the complainant" and "coerce the contemnor into complying with the court order." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1557 (11th Cir. 1996). Here, plaintiff was never ordered to be paid; nor did he even object to the sanctioned conduct. And because the sanctions were issued after trial had concluded, there was no opportunity for Appellants to "purge [the sanctions] once imposed." *Bagwell*, 512 U.S. at 837.

judge saw or heard the contemptuous conduct and so certifies"). Indeed, summary contempt proceedings arise in those rare circumstances where the court must immediately punish a person with contempt to prevent egregious disorder.

As the Supreme Court explained, "summary adjudication" of contempt is justified only when the court must act "in rapidly coercing compliance" to "maintain order in the courtroom" in the face of "actual obstruction of justice" that threatens "the integrity of the trial process." *Bagwell*, 512 U.S. at 832; *see also Pounders*, 521 U.S. at 987 ("[T]he power of courts to find summary contempt and impose punishment" is based on courts' prerogative to "act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court."). Only in such extreme circumstances necessitating "immediate punishment" to "prevent demoralization of the court's authority before the public" is "the summary contempt exception to the normal due process requirements" justified. *Pounders*, 521 U.S. at 988.

None of this has anything to do with the circumstances here. There was no finding of contempt, and none of the circumstances for "summary proceedings" in a contempt context was present. Contrary to the court's insistence that the "essentially immediate step" of "[s]ummary sanctions" was required to "preserve the orderly and fair administration of justice in the courtroom," Doc. 187 at 7, by the time the court suddenly imposed sanctions on Appellants, the jury had *already retired to deliberate*

and the *trial had ended*. No prejudice accrued to any party. Indeed, plaintiff never even objected to Ms. Branscome's remarks about the slide or her hearsay explanation; nor did he offer any argument at sidebar. From the time the court told the jury that Ms. Branscome's explanation of the Michael's Testing issue was "absolutely correct" to when the jury was dismissed, *more than an hour* had elapsed. *See* Doc. 204-10 at 103:4-153:7. This was hardly the kind of breakdown of "order in the courtroom" requiring "rapidly coercing compliance" that justifies summary contempt proceedings and their commensurate less robust due process protections. *Bagwell*, 512 U.S. at 832.

The court's suggestion that "summary" sanctions were necessary to prevent "the broader multidistrict litigation [from] becoming unmanageable" likewise does not support the summary proceedings. Doc. 187 at 7. The Michael's Testing issue by this point had been raised and addressed in three bellwether trials, and the court pointed to no evidence that Appellants' perceived "violation" in *Baker* posed an immediate threat to the management of the rest of the MDL. Even if there were some concern about a spillover effect, this was not the sort of collapse in the MDL's integrity or "obstruction of justice" for which summary contempt proceedings are reserved. *Bagwell*, 512 U.S. at 832.

The court justified its imposition of sanctions by conflating sanctions power with (inapposite) summary contempt power and invoking non-existent "summary

sanctions" authority.  Its failure to apply the correct legal standard was legal error, necessitating reversal.

## II. Appellants Did Not Violate The Make Clear Requirement, Let Alone Do So In Bad Faith

### A. Ms. Branscome *Did* Make Clear To the Jury That They Could Not Consider Any Part Of The Michael's Testing For The Truth

The court ruled Ms. Branscome violated the Make Clear Requirement "three times, one of which also violated the [c]ourt's ruling on the related motion in limine." Doc. 187 at 3.  But Ms. Branscome's closing *did* "make[] . . . clear" to the jury that the slide "is not being offered for the truth that the NRR was 23," Doc. 204-10 at 4:20-22, consistent with the motion in limine ruling.  Doc. 118 at 3 (report could be used in the context of "expert witnesses regarding the bases for their opinions using the [Michael's] Test Reports").

The court—belatedly and in violation of due process, *infra* 50 n.9—highlighted three statements from Ms. Branscome's closing argument that purportedly violated the Make Clear Requirement and the motion in limine ruling. Doc. 204-10 at 173:21-174:16; Doc. 187 at 3 & n.2.  Respectfully, the court was mistaken.

All of the cited statements were made in the context of attacking Plaintiff's expert's credibility.  The portion of the slide presentation was titled "Consistency: Were Mr. Baker And His Witnesses Consistent In Their Testimony?" which

immediately followed the portion of the presentation titled "Credibility: Is The Testimony of Mr. Baker And His Witnesses Credible?" Doc. 189-2 at 2, 19. The starting point of Ms. Branscome's discussion of the slide in question was McKinley's direct testimony acknowledging the Michael's Testing but failing to explain why he did not "place much stock in it" and "didn't show it to [the jury] at all." Doc. 204-10 at 99:16-23, 100:10-13. Indeed, as Ms. Branscome pointed out to the jury, even though plaintiff's counsel said that "we'll come back to that," referring to the Michael's Testing, "[t]hey didn't. They didn't even come back to it during Mr. McKinely's testimony . . . because that evidence is inconsistent with his opinion." *Id.* at 99:20-23. Ms. Branscome argued that it was "only when we brought it out on cross-examination that now suddenly he has all these criticisms" of the Michael's Testing. *Id.* at 100:14-16. This is quintessential expert impeachment—which is precisely what the motion in limine order allowed the parties to do. Doc. 118 at 3.

Given the foregoing context, Ms. Branscome did not believe she needed to explicitly state that the Michael's Testing could not be considered for the truth in order for it to be "clear" to the jury the limited purpose for which the slide was being used. The court's conclusion that she violated the Make Clear Requirement for failing to "immediately explain to the jury that they could not 'consider the NRR of 23 for the truth,'" is therefore erroneous. Doc. 187 at 3-4.

Moreover, Ms. Branscome's explanation to the jury after the sidebar addressed any perceived confusion. She explicitly referenced the court's prior instructions on this issue, saying, "You heard from Judge Rodgers that the testing from Michael & Associates falls into a unique evidence category; it's called hearsay." Doc. 204-10 at 102:13-15; *see also id.* at 102:24-103:3 (explaining that by "reach[ing] the opinion that the [earplugs were] defective" without "tell[ing] you [the jury] about evidence that's contrary to that opinion," that "call[s] into question the basis for his conclusion"). By the court's own later-stated standard, this alone would have been sufficient to satisfy the Make Clear Requirement: "[w]hether you gave an instruction or *whether you reminded [the jury] of my instruction*," the purpose of the Make Clear Requirement would have been adequately "conveyed." *Id.* at 176:6-10 (emphasis added).

Ms. Branscome not only "reminded" the jury of the court's prior instruction, she went on to explain that because "the testing from Michael & Associates [is] hearsay," it could only be considered "not for the truth of the testing but for the credibility that it has to the plaintiff's case on whether their experts relied on it, whether they told you about it," and that it could be used to assess the expert's credibility. *Id.* at 102:13-21. Ms. Branscome then specifically explained how this "framework" applied to evaluating Mr. McKinley. *Id.* at 102:22-103:3.

By telling the jury that they could not consider the "testing from Michael & Associates" for the "truth of the testing," Ms. Branscome necessarily made "clear" that they could not consider the NRR figure for the truth. The NRR conclusion of the Michael's Testing is a component of the Michael's Testing itself—particularly in the context of the court's prior instructions telling the jury that the broader category of evidence could not be considered for the truth, which necessarily also encompassed the narrower NRR figure. Ms. Branscome's detailed explanation of how the jury *could* consider the evidence in evaluating Mr. McKinley's credibility further cemented that the Michael's Testing data on the slide—including the NRR figure—could be used *only* in the prescribed "framework." And the court itself endorsed what Ms. Branscome said as "absolutely correct," adding only the specific NRR instruction to "make sure [the jury] understand[s]"—not to *correct* anything Ms. Branscome said. *Id.* at 103:4-7.

Significantly, throughout the *Baker* trial, the jury repeatedly had been instructed on the Michael's Testing issue, with those hearsay instructions referring to the testing generally and its results as interchangeable. There was *never* a specific focus on *only* the NRR of 23 (all emphases added):[6]

---

[6] The court thus was incorrect when it stated that "I gave a limiting instruction [in *Baker*] in which I told the jury that they could not consider the *NRR of 23* or the Michael study test data for the truth because it was hearsay." Doc. 204-10 at 154:5-8 (emphasis added).

- "[T]he ***Michael's test report and the results of the report, the report*** is hearsay . . . . So you cannot consider it for the truth of the matter asserted in the – with regard to ***the results*** in the report, but you can consider it in your evaluation of Mr. McKinley's opinions and regarding whether he did or didn't rely on it."  Doc. 204-2 at 288:7-13;

- "I'll remind you of an instruction I gave you Tuesday . . . but do remember that this is hearsay.  You may not consider ***this study for the truth of the matter asserted in the study***, but you can consider it in your evaluation of Mr. McKinley's opinion."  Doc. 204-4 at 14:11-16;

- In reference to showing a witness "the data from the open end test done by Michael & Associates," the court instructed, "this is the ***Michael's study*** that you've heard some questioning and testimony about.  Remember, ***this is hearsay. You can't consider it for the truth***."  *Id.* at 82:18-83:14;

- In reference to showing a witness "the chart from ***the Michael testing***," the court instructed, "remember ***this is hearsay, you can't consider it for the truth***."  *Id.* at 196:22-197:6;

- "***[T]he Michael study, the Michael lab standards, and the test results, that is all hearsay. You cannot consider it for the truth of that study or anything about the Michael's lab manual***.  However, you can consider, in

36

evaluating Dr. Casali's opinion, that he relied on those materials and his explanation for why he relied on those materials." Doc. 204-8 at 67:8-15;

- "*[T]he Michael's testing data and testing results* are hearsay. You may not consider this testimony for its truth. You can consider it in your evaluation of Dr. Stephenson's opinion, the fact that he relied on it." Doc. 204-9 at 249:6-10.

This was consistent with how the court treated the Michael's Testing in the earlier *EHK* and *McCombs* trials; *none* of its instructions even mentioned the NRR. The instructions in those cases, as even the court noted in its written order, provided important context for Appellants' understanding of the court's Make Clear Requirement (all emphases added):

- During *EHK*, the court explained that "[t]he *study*" is "not coming in" because it's "hearsay," but the jury could "consider that the witness did or didn't rely on it when . . . evaluat[ing] the witness's opinion." A-52-A-53 at 3:21-4:7. The court additionally noted it would instruct the jury "that they can't consider the *truth of the study*. They cannot consider the truth of the facts asserted in *that study*." A-54 at 5:17-20.

- To the jury, the court instructed: "*[T]he Michael study* is not in evidence in this trial, *it's hearsay. . . . [B]ecause the Michael study is hearsay, you cannot consider the study for the truth of the study results*. However, you

37

can consider Dr. Casali's reliance on it when you evaluate his opinion." A-57 at 131:5-12.

- In instructing the jury in *McCombs*, the court stated, "***That testing is hearsay***, so you may not consider it for the truth of what the ***test results*** show, but you can consider the fact that Dr. Casali relied on it in his opinion and you can consider that in evaluating his opinion." A-68 at 273:14-17.

- Indeed, in the *McCombs* trial, different counsel for Defendants made express reference in closing argument to the Michael's Testing as "independent" testing that was "objectively done" that found an NRR of 23—without drawing any comment or instruction from the court that this evidence was hearsay. A-77 at 112:4-17. On the contrary, the court commended both sides for a job well done following closing argument. A-79-A-80 at 155:25-156:5.

In view of all of the foregoing, Ms. Branscome plainly made "clear" that the Michael's Testing and its component parts—the study, data, results, lab standards, lab manual, ***all of it***—was hearsay and could not be considered for the truth. For the same reason, Mr. Bhimani's communication to Ms. Branscome that she "could not convey that [the slide contents] were accurate" and instead had to "frame it in terms of the [expert] reliance on it," was entirely faithful to making it "clear" to the jury

that they could not consider the Michael's Testing and its NRR conclusion for the truth.  Doc. 204-10 at 168:17-21, 101:7-12.

## B.    The Court Made No Finding Of Subjective Bad Faith

The court did not make a specific finding of bad faith, and its conclusion of a "willful" violation applied the wrong legal standard and is not supported by substantial evidence.

As noted above, inherent-power sanctions are governed by "a subjective bad-faith standard." *Purchasing Power*, 851 F.3d at 1223.  A court "must do more than conclude that a party acted in bad faith." *In re Porto*, 645 F.3d 1294, 1304 (11th Cir. 2011).  Rather, the court must make "a specific finding as to whether counsel's conduct . . . constituted or was tantamount to bad faith" before "any sanction under the court's inherent powers." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980); *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("To exercise its inherent power a court *must find* that the party acted in bad faith." (emphasis added)).  A district court's finding of bad faith will be reversed if it is not "supported by substantial evidence." *Robertson*, 493 F.3d at 1330.

Here, the court *did not make any* "specific finding" of bad faith.  *Piper*, 447 U.S. at 767.  It did not even "mention bad faith or cite the bad-faith standard." *Miller*, 2021 WL 4240972, at *3 (vacating sanctions for failure to make finding of subjective

bad faith). Because a "finding of bad faith is required," this failure alone warrants reversal. *Id.*

The court's conclusion of a "willful" violation does not substitute for a finding of subjective bad faith. The court reached that conclusion by applying an *objective reasonableness* standard, repeatedly asserting that no "*reasonable lawyer* could have construed what I said as what you just described." Doc. 204-10 at 168:24-169:1 (emphasis added); *see also id.* at 168:14-16, 171:14-15, 177:11-14. The court's written order similarly found that Appellants' conduct "cannot be reasonably construed as anything other than willful" due to their "knowledge and experience" as trial lawyers, their access to the real-time transcript, and the "specificity and unequivocality" of the Make Clear Requirement. Doc. 187 at 6-7.

But measuring Appellants' actions against "reasonable" lawyers in their position is a quintessentially *objective* test, not a determination of *subjective* bad faith. *See Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (distinguishing objective standard for statutory sanctions from subjective standard for inherent-power sanctions and noting the former is established by "behavior that grossly deviates from *reasonable* conduct" (emphasis added)). Significantly, a finding that a party's "beliefs were not reasonable" does not constitute a finding of bad faith because "[a] person may hold an unreasonable belief in good faith." *Rowe v. Gary*, 773 F. App'x 500, 504 (11th Cir. 2019).

This Court's standard for establishing bad faith in the sanctions context is stringent. Even "recklessness alone does not constitute conduct tantamount to bad faith." *Purchasing Power*, 851 F.3d at 1223. Recklessness "can be a starting point but requires something more to constitute bad faith." *Id.* at 1225. The court here made no finding of recklessness, much less any "conduct . . . so egregious" that it is "tantamount to bad faith" beyond—at most—Appellants' misunderstanding of what the court's order required. *Id.* at 1224-25. By contrast, the types of "egregious conduct" necessitating sanctions typically involve flagrant, repeated violations of court directives far beyond the misunderstanding at issue here. *See, e.g.*, *Haji v. NCR Corp.*, 834 F. App'x 562, 564 (11th Cir. 2020) ("willful and flagrant disobedience" by failure on "numerous occasions" to comply with discovery orders); *Wimbush v. Georgia*, 673 F. App'x 965, 967 (11th Cir. 2016) ("disobedience" was "willful" where plaintiff ignored repeated orders to refile an amended complaint and was "specifically told failure to comply could result in dismissal"); *Martin*, 307 F.3d at 1336 & n.2 ("continual and flagrant abuse of the judicial process," including "misleading the court about the real party in interest," "extensive discovery abuse," and using forged signatures and extortive letters); *Mitchel v. VegasSportsConsultants.com*, 2019 WL 3426038, at *3 (S.D. Fla. May 23, 2019) ("Repeated failures to comply with discovery orders, without any explanation, demonstrates a willful disregard to comply.").

The court's application of the incorrect legal standard itself warrants reversal. *See Purchasing Power*, 851 F.3d at 1223-25 (reversing sanctions where district court applied an "incorrect standard"); *Campos*, 202 F. App'x at 386 (district court abuses discretion by applying "an incorrect legal standard").

But even if the court had applied the correct standard, there still is no evidence of subjective bad faith. Appellants offered unrebutted testimony as to their understanding of the Make Clear Requirement, and the lack of any distinction, in their minds, between the hearsay nature of the Michael's Testing generally and the specific "NRR is 23" figure. *Supra* 17-18. Indeed, when viewed in the context of the rulings and instructions on the Michael's Testing issue across the three bellwether trials, Appellants' understanding of the Make Clear Requirement was entirely consistent with the court's prior treatment of the issue, not a bad faith evasion of the court's order. *Supra* 35-38; *Purchasing Power*, 851 F.3d at 1225 (in assessing sanctions, "a court examines the wrongdoing in the context of the case").

The court gave no reason to doubt Appellants' explanations, other than its legally irrelevant insistence that no "reasonable" lawyer could have held that understanding.[7] The court's further assertion that "[e]very ruling and jury

---

[7] Notably, plaintiff's counsel never objected to Ms. Branscome's use of the slide nor offered any argument at sidebar. And the court never followed up on its statement that it would "ask others who were present in the courtroom" during the morning ruling "if they had a different understanding." Doc. 204-10 at 158:3-

*(Cont'd on next page)*

instruction on the issue . . . was categorically and unambiguously directed at ensuring the jury understood it was prohibited from considering the Michael's conclusion that the NRR equaled 23 for its truth," and therefore no reasonable lawyer would have failed to specifically mention "NRR of 23" to the jury, is simply untrue. Doc. 187 at 5-6. As described above, *supra* 35-38, the court *never* before drew any distinction between the Michael's Testing generally and its results, and *never* specifically instructed the jury that the NRR of 23 in particular could not be considered for its truth. The court's insistence that its past treatment of the issue "left no room for interpretation as to what was required" is inaccurate and cannot support any sanctions order. Doc. 187 at 6; *see Berenguela-Alvarado v. Castanos*, 950 F.3d 1353, 1360 (11th Cir. 2020) (clear error where district court relied on "non-existent testimony").

The court's invocation of Appellants' years of trial experience likewise does not support a bad faith finding because it bears no relationship to their good faith understanding of the court's order. *See Byrne v. Nezhat*, 261 F.3d 1075, 1225 (11th Cir. 2001) (conduct that "does not yield the inference" of bad faith will not justify sanctions), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*,

---

4; *cf. Didie v. Howes*, 988 F.2d 1097, 1104-05 (11th Cir. 1993) (abuse of discretion where no hearing held when district court must resolve factual dispute).

553 U.S. 639 (2008). The court also faulted Appellants for not seeking clarification of the Make Clear Requirement. But that only begs the question of whether they had reason to do so given their understanding derived from how the issue had been addressed previously and the court's affirmation that Ms. Branscome's explanation to the jury was "absolutely correct." Doc. 204-10 at 103:4-5.

In short, other than a misunderstanding over the order itself, there is nothing in the record to support a finding that Appellants intended to thwart the court's authority. Under these circumstances, sanctions were not warranted. *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2021 WL 1739293, at *7 (S.D. Fla. May 3, 2021) (no sanctions under Rule 16(f) where "[a]t worst, any non-compliance appears to have resulted from a good faith misunderstanding rather than from an intentional or willful disobedience of a court order").[8]

---

[8] The serious repercussions sanctions can have for an attorney, beyond just monetarily, are important here. In California, where Appellants reside, they must self-report sanctions to the State Bar, *see* Cal. Bus. & Prof. Code § 6068(o)(3), which could trigger a disciplinary investigation, *see Matter of Respondent Y*, 1998 WL 240126, at *3 (Cal. Bar Ct. May 5, 1998). Consequences could "include[e] disbarment, even if a lawyer has no prior record of discipline," Rules of Procedure of the State Bar of California, Tit. IV, §§ 1.3, 1.8(c). Sanctions may also be an obstacle to future pro hac vice admissions. *See, e.g., See Collins v. Collins*, 481 P.3d 270, 278 (Okla. Civ. App. 2019) (attorney's "history of being sanctioned" was "clearly relevant to the trial court's decision" to deny *pro hac vice* admission); *Kampitch v. Lach*, 405 F. Supp. 2d 210, 215 (D.R.I. 2005) (party seeking admission *pro hac vice* is required to certify, *inter alia*, "that he/she has never been disciplined or sanctioned by any court" or, if he or she has, then the attorney must "provide the pertinent details").

### III. The District Court Failed To Afford Appellants Due Process

As noted above, courts imposing inherent-power sanctions "***must*** afford the sanctioned party due process . . . in determining that the requisite bad faith exists." *In re Mroz*, 65 F.3d at 1575 (emphasis added). Here, the court both failed to provide adequate notice and a meaningful opportunity to be heard and enforced an order too vague to support sanctions.

> ### A. The Court Failed To Give Appellants Notice Of Possible Sanctions, Notice Of A Hearing, Or A Meaningful Opportunity To Be Heard

"When the individual being sanctioned is an attorney before the court," due process requires "that the attorney must, first, be afforded 'fair notice that [his or her] conduct may warrant sanctions and the reasons why,' and, second, 'be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify [his or her] actions.'" *Kornhauser*, 685 F.3d at 1257 (quoting *In re Mroz*, 65 F.3d at 1575-76). The notice and opportunity to be heard must be "meaningful," *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)—the attorney must be sufficiently apprised to allow her to "adequately prepare to litigate the issues at the hearing." *Christensen v. Apfel*, 1999 WL 33595519, at *4 (M.D. Fla. Nov. 5, 1999); *see also Shaygan*, 652 F.3d at 1318 (court violated sanctioned prosecutors' rights by denying them "a meaningful opportunity to be heard").

Here, the court violated Appellants' procedural rights in a number of ways.

*First*, the court failed to provide any notice to Appellants that their actions could result in sanctions before declaring "there will be sanctions." Doc. 204-10 at 157:22-159:12; *see Kornhauser*, 685 F.3d at 1257; *Shaygan*, 652 F.3d at 1317-18 (court violated prosecutors' due process rights when it "public[ly] reprimanded them without first affording . . . notice that it was considering a public reprimand"). The first time the court gave any indication that Appellants were facing potential sanctions was when it was *actually sanctioning* them, well after the purported offending statements. Doc. 204-10 at 157:22-159:12.

There had been no previous indication that either attorney was facing sanctions. Plaintiff had not objected to Ms. Branscome's closing. And the court itself, in response to her explanation to the jury that the Michael's Testing was hearsay, told the jury that "Ms. Branscome is absolutely correct in the way she's described that to you." *Id.* at 103:4-5.

This was nothing like the typical notice, such as an adversary's motion for sanctions, an order to show cause, or repeated warnings that certain conduct will result in sanctions. *See, e.g.*, *Thompson v. C.R. Bard, Inc.*, 2020 WL 3052227, at *6 (S.D. Ga. June 8, 2020) (due process satisfied where court provided "two show cause Orders . . .well in advance of the show cause hearing"); *Kovelesky v. First Data Corp.*, 2012 WL 12949625, at *2 (S.D. Fla. Dec. 12, 2012), *aff'd*, 534 F. App'x 811 (11th Cir. 2013) (court explained that it would "issue a show cause order directing

counsel . . . to explain why sanctions . . . should not be imposed"); *Dashtpeyma v. Liberty Ins. Corp.*, 2012 WL 13012622, at \*4 (N.D. Ga. July 10, 2012) (court provided "show cause" order even after noting that plaintiff had already been given proper notice and opportunity to be heard when defendants filed a motion including a request for attorney's fees); *Danubis Grp., LLC v. Landmark Am. Ins. Co.*, 685 F. App'x 792, 802 n.2 (11th Cir. 2017) ("[T]he magistrate judge's repeated warnings that Ambler could be sanctioned for his various discovery inadequacies . . . sufficed to satisfy due process."). By contrast, Appellants had *no* "notice about the possibility of sanctions against them" until they were actually *being* sanctioned. *Miller*, 2021 WL 4240972, at \*3.

*Second*, the court did not provide any notice of an opportunity to be heard. Instead, the court told Appellants, "***I don't need to hear from you about the facts*** . . . . ***I will perhaps hear from you later about this*** . . . . ***[I]f I decide that I want to hear from you,*** I'll give you that opportunity." Doc. 204-10 at 159:13-160:7 (emphasis added). The court then suggested any defense would be futile, reiterating that Appellants' conduct was a "violation of my order" and that "***there's nothing you can do to ameliorate it***." *Id.* at 160:20-161:3 (emphasis added).

Appellants heard nothing further from the court until the parties were summoned back to court later that evening. With no notice of a hearing, they were caught off guard when the court suddenly demanded that they explain "why

sanctions shouldn't be imposed for what happened this morning." *Id.* at 162:11-14. As Ms. Branscome stated, "***I don't have my materials with me. I thought we were hearing from the jury***." *Id.* at 162:16-18 (emphasis added). Although an abbreviated 10-minute "hearing" followed, Appellants were never provided with sufficient time to "adequately prepare to litigate the issues at the hearing," which is the very "purpose of the notice of hearing." *Christensen*, 1999 WL 33595519, at *4; *see also*, *e.g.*, *Reynolds v. Ala. Dep't of Transp.*, 10 F. Supp. 2d 1263, 1277 (M.D. Ala. 1998) (in civil contempt case, holding that "[t]he amount of notice and time to prepare a defense that [due process] require[s] . . . can never be less than is required to mount an adequate defense").

Had adequate notice been afforded, Appellants could have explained their understanding of the Make Clear Requirement in part from the context of every other ruling and instruction on this issue. *See supra* 35-38. Although Ms. Branscome explained at the "hearing" that in her mind, there was no distinction between the Michael's Testing and the NRR of 23, *supra* 18, Appellants could not marshal by memory the precise language used in past rulings and instructions in *Baker* and the other bellwether trials to formulate a comprehensive defense. Appellants thus were not able to adequately establish the full "context" in which an attorney's alleged "bad faith" must be considered. *See Purchasing Power*, 851 F.3d at 1225 ("In assessing whether a party should be sanctioned, a court examines the wrongdoing in

the context of the case, including the culpability of other parties."); *see also Campos*, 202 F. App'x at 385 (due process rights violated where sanctioned parties could have marshalled evidence and arguments in their favor, had they been given adequate notice and hearing).

*Third*, the "hearing" was not constitutionally "meaningful." The court had already prejudged the matter, telling Appellants hours before the surprise hearing that "there **will be** sanctions," that "I ***don't need to hear from you about the facts***," Doc. 204-10 at 159:11-23, that this was "a violation of my order," and that "***there's nothing you can do to ameliorate it***," *id.* at 160:20-161:3. *See Kornhauser*, 685 F.3d at 1258 (attorney's due process rights violated where court "already branded counsel's violation of the local rule 'intentional' and worthy of sanction" without affording counsel an opportunity to show cause). This "opportunity to be heard"— with no allowance for written submissions and no time for adequate preparation, and which, by the court's own admonition, was futile—was anything but "meaningful." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner"); *cf. Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process prohibits "prejudgment" by adjudicator).

As discussed above, there was no reason for the court to curtail the process that was due. *Supra* 30-31. Appellants could and should have been afforded basic

procedural protections.  The court's failure to do so warrants reversal.[9]

## B.    The Court's "Make Clear" Requirement Was Too Vague To Support Sanctions

A "fundamental principle" of due process is that laws and regulations "must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253.  Often manifested in the "void for vagueness" doctrine, which requires the invalidation of enactments that do not sufficiently apprise "regulated parties [of] what is required of them so they may act accordingly," this same principle applies throughout "our legal system." *Id.*  Court orders, just as much as statutes or regulations, must be sufficiently clear that the parties are "able to discern from the language of a court's order the actions necessary to comply with the court's directive." *Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 268 (4th Cir. 2019). Orders on which sanctions are based are subject to the same vagueness considerations. *See, e.g.*, *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542-43

---

[9]  The court never gave Appellants *any* notice of, or *any* opportunity to be heard on, its accusation that two portions of Ms. Branscome's closing violated the Make Clear Requirement *and* the motion in limine order by explicitly presenting the Michael's Testing for its truth. *Supra* 19.  Those accusations were levelled for the first time *after* the "hearing" and *while* the court was reading its sanctions order into the record. *See* Doc. 204-10 at 173:16-174:16.  The court did not even mention a third purportedly violative statement *until the written order four days later*. *See* Doc. 187 at 3 & n.2.  The accusations related to these three portions of Ms. Branscome's closing thus cannot constitutionally form the basis of any sanctions order.

(11th Cir. 1993) (analyzing whether court's "discovery orders" were "definite enough to support Rule 37 sanctions"); *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1340 (9th Cir. 1985) (analyzing whether court order was "too vague to support the imposition of discovery sanctions").

As discussed above, Appellants did "make clear" to the jury that they could not consider for the truth the Michael's Testing, including, necessarily, its NRR conclusion. *Supra* 32-38. But insofar as the court insisted that its Make Clear Requirement could not be met without recitation of the magic words, "the NRR of 23 cannot be considered for the truth," the Make Clear Requirement was simply too vague to support sanctions for failing to do so.

The court's full instruction was "Here's the deal: If Ms. Branscome *makes that clear* in her closing that this is not being offered for the truth that the NRR was 23, then I'm fine with it. If not, it's not coming in." Doc. 204-10 at 4:20-23 (emphasis added). Insofar as this instruction required the use of specific magic words, it did not give Appellants fair notice of what was required of them in order to "make[] that clear." While the court insisted afterward that its directive "allowed no room for interpretation," it was definitionally the opposite. *Id.* at 173:13-15. To instruct someone to "make that clear" is open to interpretation because what is "clear" to one may not be "clear" to another. In *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), for example, the Supreme Court struck down an ordinance

prohibiting "annoying" conduct precisely because "[c]onduct that annoys some people does not annoy others." Insofar as the Make Clear Requirement "require[d] the doing of an act in terms so vague that men of common intelligence . . . differ[ed] as to its application," it "violate[d] the first essential of due process of law." *Fox Television*, 567 U.S. at 253.

The sidebar during Ms. Branscome's closing did not clarify what she actually had to *do* to "make" the issue "clear." There, the court said

> I told [Mr. Bhimani] you had to tell the jury they could not consider this for the truth. . . . You, in talking about it in terms of the truth, you said they had an NRR of 23. You didn't connect that to Mr. McKinley. The slide is up there, but you're also talking—*so you're going to have to clear this up to my satisfaction or I'm going to clear it up.* They need to know they cannot consider the 23 for the truth of the results of that test.

Doc. 204-10 at 101:13-22 (emphasis added). The court indicated what it wanted the jury to take away, but did not articulate *how* Ms. Branscome was to make that "clear," except to say that the explanation had to be "up to my satisfaction."

To add to the confusion, the court contradictorily claimed, while stating its findings, that "***it doesn't matter to me how you conveyed it***," and that simply "***remind[ing] [the jury] of my instruction***" would satisfy the Make Clear Requirement. *Id.* at 176:6-10. But Ms. Branscome *did* "remind" the jury about the court's prior instructions—none of which mentioned "NRR"—yet she was sanctioned anyway. *See id.* at 102:13-14; *supra* 34.

52

"[A] court must craft its orders so that those who seek to obey may know precisely what the court intends to forbid." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1411 (11th Cir. 1998). To the extent that the Make Clear Requirement could be satisfied *only* by reciting the magic "NRR" words, it failed this basic requirement of due process. Sanctions imposed for purportedly violating that vague directive should be vacated.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's imposition of sanctions.

Respectfully submitted,

Dated: October 28, 2021

/s/ *Kevin S. Rosen*

GIBSON DUNN & CRUTCHER LLP
Kevin S. Rosen
333 S. Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7635
krosen@gibsondunn.com

Thomas H. Dupree Jr.
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Tel: (202) 955-8500
tdupree@gibsondunn.com

Nancy E. Hart
Timothy Sun
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-3897
nhart@gibsondunn.com

tsun@gibsondunn.com

MOORE, HILL & WESTMORELAND, P.A.
Larry Hill
Charles F. Beall, Jr.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola, FL 32502
Tel: (850) 434-3541
lhill@mhw-law.com
cbeall@mhw-law.com

*Attorneys for Appellants Kimberly O.*
*Branscome and Jay L. Bhimani*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

**1.      Type Volume**

  X   This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 12,895 words.

**2.      Type face and Type-Style**

  X   This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point Times New Roman font.

Dated:  October 28, 2021

/s/ *Kevin S. Rosen*

Kevin S. Rosen
*Attorney for Appellants*

# INDEX OF ADDENDUM

**PAGE NO.**

Cal. Bus. & Prof. Code § 6068 ............................................................ A-01

Fed. R. App. P. 4 ................................................................................. A-04

Fed. R. Crim. P. 42 ............................................................................. A-10

Rules of Procedure of the State Bar of California, Tit. IV, §§ 1.3, 1.8 .............. A-12

April 9, 2021 *EHK* Trial Transcript Excerpts ..................................... A-34

April 27, 2021 *EHK* Trial Transcript Excerpts ................................... A-50

May 26, 2021 *McCombs* Trial Transcript Excerpts ........................... A-63

May 28, 2021 *McCombs* Trial Transcript Excerpts............................ A-74

West's Annotated California Codes
Business and Professions Code (Refs & Annos)
Division 3. Professions and Vocations Generally (Refs & Annos)
Chapter 4. Attorneys (Refs & Annos)
Article 4. Admission to the Practice of Law (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 6068

## § 6068. Duties of attorney

Effective: January 1, 2019
Currentness

It is the duty of an attorney to do all of the following:

(a) To support the Constitution and laws of the United States and of this state.

(b) To maintain the respect due to the courts of justice and judicial officers.

(c) To counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of a person charged with a public offense.

(d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.

(e)(1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.

(2) Notwithstanding paragraph (1), an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.

(f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.

(g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.

(h) Never to reject, for any consideration personal to himself or herself, the cause of the defenseless or the oppressed.

A-01

(i) To cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against himself or herself. However, this subdivision shall not be construed to deprive an attorney of any privilege guaranteed by the Fifth Amendment to the Constitution of the United States, or any other constitutional or statutory privileges. This subdivision shall not be construed to require an attorney to cooperate with a request that requires him or her to waive any constitutional or statutory privilege or to comply with a request for information or other matters within an unreasonable period of time in light of the time constraints of the attorney's practice. Any exercise by an attorney of any constitutional or statutory privilege shall not be used against the attorney in a regulatory or disciplinary proceeding against him or her.

(j) To comply with the requirements of Section 6002.1.

(k) To comply with all conditions attached to any disciplinary probation, including a probation imposed with the concurrence of the attorney.

(*l*) To keep all agreements made in lieu of disciplinary prosecution with the State Bar.

(m) To respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services.

(n) To provide copies to the client of certain documents under time limits and as prescribed in a rule of professional conduct which the board shall adopt.

(*o*) To report to the State Bar, in writing, within 30 days of the time the attorney has knowledge of any of the following:

(1) The filing of three or more lawsuits in a 12-month period against the attorney for malpractice or other wrongful conduct committed in a professional capacity.

(2) The entry of judgment against the attorney in a civil action for fraud, misrepresentation, breach of fiduciary duty, or gross negligence committed in a professional capacity.

(3) The imposition of judicial sanctions against the attorney, except for sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).

(4) The bringing of an indictment or information charging a felony against the attorney.

(5) The conviction of the attorney, including any verdict of guilty, or plea of guilty or no contest, of a felony, or a misdemeanor committed in the course of the practice of law, or in a manner in which a client of the attorney was the victim, or a necessary element of which, as determined by the statutory or common law definition of the misdemeanor, involves improper conduct of an attorney, including dishonesty or other moral turpitude, or an attempt or a conspiracy or solicitation of another to commit a felony or a misdemeanor of that type.

A-02

(6) The imposition of discipline against the attorney by a professional or occupational disciplinary agency or licensing board, whether in California or elsewhere.

(7) Reversal of judgment in a proceeding based in whole or in part upon misconduct, grossly incompetent representation, or willful misrepresentation by an attorney.

(8) As used in this subdivision, "against the attorney" includes claims and proceedings against any firm of attorneys for the practice of law in which the attorney was a partner at the time of the conduct complained of and any law corporation in which the attorney was a shareholder at the time of the conduct complained of unless the matter has to the attorney's knowledge already been reported by the law firm or corporation.

(9) The State Bar may develop a prescribed form for the making of reports required by this section, usage of which it may require by rule or regulation.

(10) This subdivision is only intended to provide that the failure to report as required herein may serve as a basis of discipline.

**Credits**
(Added by Stats.1939, c. 34, p. 355, § 1. Amended by Stats.1985, c. 453, § 11; Stats.1986, c. 475, § 2; Stats.1988, c. 1159, § 5; Stats.1990, c. 1639 (A.B.3991), § 4; Stats.1999, c. 221 (S.B.143), § 1; Stats.1999, c. 342 (S.B.144), § 2; Stats.2001, c. 24 (S.B.352), § 4; Stats.2003, c. 765 (A.B.1101), § 1, operative July 1, 2004; Stats.2018, c. 659 (A.B.3249), § 50, eff. Jan. 1, 2019.)

West's Ann. Cal. Bus. & Prof. Code § 6068, CA BUS & PROF § 6068
Current with urgency legislation through Ch. 650 of 2021 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

A-03

United States Code Annotated
    Federal Rules of Appellate Procedure (Refs & Annos)
        Title II. Appeal from a Judgment or Order of a District Court

Federal Rules of Appellate Procedure Rule 4, 28 U.S.C.A.

# Rule 4. Appeal as of Right--When Taken

Currentness

**(a) Appeal in a Civil Case.**

**(1) Time for Filing a Notice of Appeal.**

**(A)** In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

**(B)** The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

**(i)** the United States;

**(ii)** a United States agency;

**(iii)** a United States officer or employee sued in an official capacity; or

**(iv)** a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf--including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

**(C)** An appeal from an order granting or denying an application for a writ of error coram nobis is an appeal in a civil case for purposes of Rule 4(a).

**(2) Filing Before Entry of Judgment.** A notice of appeal filed after the court announces a decision or order--but before the entry of the judgment or order--is treated as filed on the date of and after the entry.

**(3) Multiple Appeals.** If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

**A-04**

**(4) Effect of a Motion on a Notice of Appeal.**

**(A)** If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure--and does so within the time allowed by those rules--the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

**(i)** for judgment under Rule 50(b);

**(ii)** to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

**(iii)** for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

**(iv)** to alter or amend the judgment under Rule 59;

**(v)** for a new trial under Rule 59; or

**(vi)** for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

**(B)(i)** If a party files a notice of appeal after the court announces or enters a judgment--but before it disposes of any motion listed in Rule 4(a)(4)(A)--the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

**(ii)** A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal--in compliance with Rule 3(c)--within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

**(iii)** No additional fee is required to file an amended notice.

**(5) Motion for Extension of Time.**

**(A)** The district court may extend the time to file a notice of appeal if:

**(i)** a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

**(ii)** regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

**(B)** A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

**(C)** No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

**(6) Reopening the Time to File an Appeal.** The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

**(A)** the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

**(B)** the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

**(C)** the court finds that no party would be prejudiced.

**(7) Entry Defined.**

**(A)** A judgment or order is entered for purposes of this Rule 4(a):

**(i)** if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

**(ii)** if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

**(B)** A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

**(b) Appeal in a Criminal Case.**

**(1) Time for Filing a Notice of Appeal.**

**A-06**

**(A)** In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

**(i)** the entry of either the judgment or the order being appealed; or

**(ii)** the filing of the government's notice of appeal.

**(B)** When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

**(i)** the entry of the judgment or order being appealed; or

**(ii)** the filing of a notice of appeal by any defendant.

**(2) Filing Before Entry of Judgment.** A notice of appeal filed after the court announces a decision, sentence, or order--but before the entry of the judgment or order--is treated as filed on the date of and after the entry.

**(3) Effect of a Motion on a Notice of Appeal.**

**(A)** If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

**(i)** for judgment of acquittal under Rule 29;

**(ii)** for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

**(iii)** for arrest of judgment under Rule 34.

**(B)** A notice of appeal filed after the court announces a decision, sentence, or order--but before it disposes of any of the motions referred to in Rule 4(b)(3)(A)--becomes effective upon the later of the following:

**(i)** the entry of the order disposing of the last such remaining motion; or

**(ii)** the entry of the judgment of conviction.

A-07

**(C)** A valid notice of appeal is effective--without amendment--to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

**(4) Motion for Extension of Time.** Upon a finding of excusable neglect or good cause, the district court may--before or after the time has expired, with or without motion and notice--extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

**(5) Jurisdiction.** The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

**(6) Entry Defined.** A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

**(c) Appeal by an Inmate Confined in an Institution.**

**(1)** If an institution has a system designed for legal mail, an inmate confined there must use that system to receive the benefit of this Rule 4(c)(1). If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing and:

**(A)** it is accompanied by:

**(i)** a declaration in compliance with 28 U.S.C. § 1746--or a notarized statement--setting out the date of deposit and stating that first-class postage is being prepaid; or

**(ii)** evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid; or

**(B)** the court of appeals exercises its discretion to permit the later filing of a declaration or notarized statement that satisfies Rule 4(c)(1)(A)(i).

**(2)** If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

**(3)** When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d) Mistaken Filing in the Court of Appeals.** If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.

A-08

**CREDIT(S)**

(As amended Apr. 30, 1979, eff. Aug. 1, 1979; Nov. 18, 1988, Pub.L. 100-690, Title VII, § 7111, 102 Stat. 4419; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 27, 1995, eff. Dec. 1, 1995; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 28, 2016, eff. Dec. 1, 2016; Apr. 27, 2017, eff. Dec. 1, 2017.)

Footnotes

1    A redraft of Rule 4(a)(7) was faxed to members of the Appellate Rules Committee two weeks after our meeting in New Orleans. The Committee consented to the redraft without objection.

F. R. A. P. Rule 4, 28 U.S.C.A., FRAP Rule 4

Including Amendments Received Through 10-1-21

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**A-09**

United States Code Annotated
  Federal Rules of Criminal Procedure for the United States District Courts (Refs & Annos)
    Title VIII. Supplementary and Special Proceedings

Federal Rules of Criminal Procedure, Rule 42

# Rule 42. Criminal Contempt

Currentness

**(a) Disposition After Notice.** Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.

**(1) Notice.** The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:

**(A)** state the time and place of the trial;

**(B)** allow the defendant a reasonable time to prepare a defense; and

**(C)** state the essential facts constituting the charged criminal contempt and describe it as such.

**(2) Appointing a Prosecutor.** The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.

**(3) Trial and Disposition.** A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

**(b) Summary Disposition.** Notwithstanding any other provision of these rules, the court (other than a magistrate judge) may summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies; a magistrate judge may summarily punish a person as provided in 28 U.S.C. § 636(e). The contempt order must recite the facts, be signed by the judge, and be filed with the clerk.

**CREDIT(S)**
(As amended Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 29, 2002, eff. Dec. 1, 2002.)

Fed. Rules Cr. Proc. Rule 42, 18 U.S.C.A., FRCRP Rule 42

Including Amendments Received Through 10-1-21

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**A-11**



# Rules of Procedure
# of the
# State Bar of California

**June 1, 2021**

# Rules of Procedure
# of the
# State Bar of California

With Amendments Adopted by the Board of Trustees (formerly Board of Governors) Effective January 1, 2011, with subsequent revisions

**Title 5:**      **Discipline**

Division 1      **General Rules Case Processing**

Division 2      **Case Processing**

Division 3      **Review Department and Powers Delegated by Supreme Court**

Division 4      **Involuntary Inactive Enrollment Proceedings**

Division 5      **Probation Proceedings**

Division 6      **Special Proceedings**

Division 7      **Regulatory Proceedings**

**Title III:**      **General Provisions**

**Title IV:**      **Standards for Attorney Sanctions for Professional Misconduct**

# PREFACE

The Rules of Procedure of the State Bar of California are adopted by the Board of Trustees (formerly Board of Governors) of the State Bar in order to facilitate and govern proceedings conducted through the State Bar Court and otherwise.  On September 22, 2010, the Board approved amendments to the rules that govern procedures in the State Bar Court.  The amendments involve some substantive changes, as well as reordering and renumbering of the rules to make them clearer, better organized and easier to read.

Effective January 1, 2011, the amended rules will apply to all pending and future matters filed in the State Bar Court, except as to:

1. Hearing Department proceedings in which the taking of testimony or the offering of evidence at trial has commenced;

2. Review Department matters in which a request for review is filed prior to January 1, 2011; and

3. Any other particular proceeding pending as of the effective date in which the Court orders the application of former rules based on a determination that injustice would otherwise result.

The amended rules (rules 5.1 to 5.466) are found in Title 5 and conform to the new organizational structure for all the Rules of the State Bar.  The revised rules begin with the number 5 (for Title 5), which is followed by a period and then a sequential number.

# TABLE OF CONTENTS

## TITLE 5 – DISCIPLINE

**DIVISION 1**      **GENERAL RULES**

Rule 5.1      Title and Authority
Rule 5.2      Authority to Adopt
Rule 5.3      Ordinary Meanings
Rule 5.4      Definitions
Rule 5.5      References to Statutes and Rules
Rule 5.6      Scope
Rule 5.7      Assignment of Judges Pro Tempore
Rule 5.8      Disposition of Pending Matters After a Judge's Term Expires
Rule 5.9      Public Nature of State Bar Court Proceedings
Rule 5.10      Confidential Proceedings
Rule 5.11      Public Records Concerning Resignations
Rule 5.12      Order Sealing Portions of the Record
Rule 5.13      Deliberations Are Not Public
Rule 5.14      Recorded or Reported Proceedings
Rule 5.15      Preparation of Transcripts
Rule 5.16      Photographs, Recordings, and Broadcasts of State Bar Court Proceedings

**DIVISION 2**      **CASE PROCEEDINGS**

**Chapter 1**      **Commencement of Proceedings**

Rule 5.20      Beginning Proceeding
Rule 5.21      Limitations Period
Rule 5.22      Venue
Rule 5.23      Transfer of Venue
Rule 5.24      Where to File Pleadings
Rule 5.25      Service of Initial Pleading
Rule 5.26      Service of Later Pleadings
Rule 5.26.1      Electronic Service by Parties or Court
Rule 5.26.2      Electronic Signature
Rule 5.27      Proof of Service
Rule 5.27.1      Proof of Electronic Service
Rule 5.28      Computing Time
Rule 5.29      Orders Shortening or Extending Time; Late Filing
Rule 5.30      Prefiling; Early Neutral Evaluation Conference
Rule 5.31      Change of Counsel of Record

**Chapter 2**        **Pleadings, Motions, and Stipulations**

| | |
|---|---|
| Rule 5.40 | General Rules of Pleadings |
| Rule 5.41 | Notice of Disciplinary Charges |
| Rule 5.42 | Motions that Extend Time to File Response |
| Rule 5.43 | Response to Notice of Disciplinary Charges |
| Rule 5.44 | Amended Pleadings |
| Rule 5.44.1 | Status Conferences |
| Rule 5.45 | Motions |
| Rule 5.46 | Disqualifying a Judge |
| Rule 5.47 | Consolidation |
| Rule 5.48 | Severance |
| Rule 5.49 | Continuances |
| Rule 5.50 | Abatement |
| Rule 5.51 | Mental Incapacity |
| Rule 5.52 | Military Service |
| Rule 5.52.1 | Settlement Conference |
| Rule 5.52.2 | Settlement Conference Judge |
| Rule 5.52.3 | Notice of Designation of Settlement Judge |
| Rule 5.52.4 | Meet and Confer |
| Rule 5.52.5 | Settlement Conference Statements |
| Rule 5.52.6 | Confidentiality of Settlement Conferences |
| Rule 5.53 | Stipulations Generally |
| Rule 5.54 | Stipulations to Facts Only |
| Rule 5.55 | Stipulations to Facts and Conclusions of Law |
| Rule 5.56 | Stipulations to Facts, Conclusions of Law, and Disposition |
| Rule 5.57 | Stipulations to Disposition |
| Rule 5.58 | Approval of Stipulations by a Hearing Judge |

**Chapter 3**        **Subpoenas and Discovery**

| | |
|---|---|
| Rule 5.60 | Investigation Subpoenas |
| Rule 5.61 | Discovery Subpoenas and Depositions |
| Rule 5.62 | Trial Subpoenas |
| Rule 5.63 | Proceedings on Motion to Quash Subpoena |
| Rule 5.64 | Approved Subpoena Forms |
| Rule 5.65 | Discovery Procedures |
| Rule 5.65.1 | Expert Disclosure / Discovery |
| Rule 5.66 | Motion to Request Other Discovery |
| Rule 5.67 | Prohibited Discovery |
| Rule 5.68 | Physical and Mental Examinations |
| Rule 5.69 | Motions to Compel Discovery and Sanctions |
| Rule 5.70 | Contempt Proceedings |
| Rule 5.71 | Discovery Review |

**Chapter 4**          **Defaults**

Rule 5.80          Default Procedure for Failure to File Timely Response
Rule 5.81          Default Procedure for Failure to Appear at Trial
Rule 5.82          Effects of Default
Rule 5.83          Vacating or Setting Aside Default
Rule 5.84          Interlocutory Review of Orders Denying or Granting Relief from Default
Rule 5.85          Petition for Disbarment After Default
Rule 5.86          Review of Orders on Petitions for Disbarment

**Chapter 5**          **Trials**

Rule 5.100          Obligation to Appear at Trial
Rule 5.101          Pretrial Statements and Pretrial Conferences
Rule 5.101.1          Trial Exhibits
Rule 5.101.2          Objections to Proposed Exhibits
Rule 5.102          Trial
Rule 5.102.1          Order of Proof in Disciplinary Proceeding
Rule 5.102.2          Order of Proof in Other Proceedings
Rule 5.103          The State Bar's Burden of Proof
Rule 5.104          Evidence
Rule 5.105          Evidence of Client Security Fund Proceedings
Rule 5.106          Prior Record of Discipline
Rule 5.107          Victim's Impact Statement
Rule 5.108          Admissibility of Complaints
Rule 5.109          Alleged Misconduct of Another Attorney
Rule 5.110          Failure to Meet Burden of Proof
Rule 5.111          Submission and Decision
Rule 5.112          Post-trial Motions in the Hearing Department
Rule 5.113          Motion to Reopen Record
Rule 5.114          Motion for New Trial
Rule 5.115          Motion for Reconsideration

**Chapter 6**          **Disposition and Costs**

Rule 5.120          Sending Disciplinary Recommendations to the Supreme Court
Rule 5.121          Waiver of Review by Review Department
Rule 5.122          Types of Resolution; Procedure; Review
Rule 5.123          Dismissal With or Without Prejudice; Effect
Rule 5.124          Grounds for Dismissal
Rule 5.125          Termination Because of Death
Rule 5.126          Admonition
Rule 5.127          Public and Private Reprovals
Rule 5.128          Reprovals with Conditions
Rule 5.129          Certification and Assessment of Costs
Rule 5.130          Order Assessing Costs Against Disciplined or Resigning Respondent

Rule 5.131  Award of Costs to Respondent Exonerated of All Charges After Trial

Rule 5.132  Stipulating to Relief from Payment of Costs or Extension of Time to Pay Costs

Rule 5.133  Approval of Agreements to Compromise Judgments for Client Security Fund Payments and Assessments

Rule 5.134  Effect of Default on Installment Payments

Rule 5.135  Mandatory Remedial Education in Ethics

Rule 5.136  Reimbursement to Client Security Fund

Rule 5.137  Imposition and Payment of Monetary Sanctions (Bus. & Prof. Code, § 6086.13.)

Rule 5.138  Motions for Relief from Complying or Extension of Time to Comply with Order Imposing Monetary Sanctions

Rule 5.139  Stipulating to Relief from Payment of Monetary Sanctions or Extension of Time to Pay Monetary Sanctions

**DIVISION 3**  **REVIEW DEPARTMENT AND POWERS DELEGATED BY SUPREME COURT**

Rule 5.150  Petition for Interlocutory Review and for Review of Specified Matters

Rule 5.151.1  Number of Copies of Filed Documents

Rule 5.151.2  Record on Review

Rule 5.152  Appellant's Brief

Rule 5.152.1  Late Filings, Extensions of Time, Continuances, and Preference

Rule 5.153  Subsequent Briefs

Rule 5.154  Oral Argument Before Review Department

Rule 5.155  Actions by Review Department

Rule 5.156  Additional Evidence Before Review Department

Rule 5.157  Summary Review Program

Rule 5.158  Reconsideration of Review Department Actions

Rule 5.159  Review Department Opinions as Precedent

Rule 5.160  Settlement Conferences on Review

Rule 5.161  Exercise of Powers Delegated by Supreme Court

Rule 5.162  Motions for Relief under California Rules of Court, Rule 9.10

**DIVISION 4**  **INVOLUNTARY INACTIVE ENROLLMENT PROCEEDINGS**

**Chapter 1**  **Bus. & Prof. Code § 6007(b)(1): Insanity or Mental Incompetence**

Rule 5.170  Nature of Proceeding

Rule 5.171  Beginning Proceeding

Rule 5.172  Proceedings on Motion; Actions Taken by Court

Rule 5.173  Proceedings on Order to Show Cause

Rule 5.174  Representation by Counsel

Rule 5.175  Effective Date

Rule 5.176  Review

Rule 5.177  Inapplicable Rules

**Chapter 2**          **Bus. & Prof. Code § 6007(b)(2): Assumption of Jurisdiction Over Law Practice**

Rule 5.180          Nature of Proceeding
Rule 5.181          Beginning Proceeding
Rule 5.182          Proceedings on Motion
Rule 5.183          Order of Involuntary Inactive Enrollment
Rule 5.184          Effective Date
Rule 5.185          Review
Rule 5.186          Inapplicable Rules

**Chapter 3**          **Bus. & Prof. Code § 6007(b)(3): Mental Infirmity, Illness, or Habitual Use of Intoxicants**

Rule 5.190          Nature of Proceeding
Rule 5.191          Beginning Proceeding
Rule 5.192          Representation by Counsel
Rule 5.193          Failure to Comply with Order for Physical or Mental Examination
Rule 5.194          Stipulation for Transfer to Inactive Enrollment
Rule 5.195          Hearing on Merits
Rule 5.196          Decision
Rule 5.197          Effective Date
Rule 5.198          Review
Rule 5.199          Inapplicable Rules

**Chapter 4**          **Bus. & Prof. Code § 6007(b): Transfer from Inactive to Active Enrollment**

Rule 5.205          Petition for Transfer to Active Enrollment
Rule 5.206          Medical and Hospital Records
Rule 5.207          Stipulation for Transfer to Active Enrollment
Rule 5.208          Hearing on Petition
Rule 5.209          Decision
Rule 5.210          Transfer to Active Status
Rule 5.211          Review
Rule 5.212          Inapplicable Rules

**Chapter 5**          **Bus. & Prof. Code § 6007(c)(1): Failure to Maintain Address of Record**

Rule 5.215          Nature of Proceeding
Rule 5.216          Issues
Rule 5.217          Application for Involuntary Inactive Enrollment
Rule 5.218          Hearing
Rule 5.219          Order to Transfer to Inactive Enrollment
Rule 5.220          Review
Rule 5.221          Inapplicable Rules

**Chapter 6**          **Bus. & Prof. Code § 6007(c)(1)-(3): Threat of Harm**

Rule 5.225          Nature of Proceeding
Rule 5.226          Application for Involuntary Enrollment
Rule 5.227          Attorney's Response to Application and Right to Hearing
Rule 5.228          Stipulation to Involuntary Inactive Enrollment
Rule 5.229          Expedited Hearing
Rule 5.230          Evidence
Rule 5.231          Decision; Denial Without Prejudice
Rule 5.232          Review
Rule 5.233          Inapplicable Rules
Rule 5.234          Beginning Disciplinary Proceeding after Involuntary Inactive Enrollment Granted
Rule 5.235          Allegations in Notice of Disciplinary Charges
Rule 5.236          Expedited Disciplinary Proceedings
Rule 5.237          Undue Delay
Rule 5.238          Review of Order on Motion for Transfer to Active Enrollment

**Chapter 7**          **Bus. & Prof. Code § 6007(c)(2): Transfer from Inactive to Active Enrollment**

Rule 5.240          Petition
Rule 5.241          Stipulations
Rule 5.242          Decision; Denial Without Prejudice
Rule 5.243          Limitations on Effect of Transfer
Rule 5.244          Review
Rule 5.245          Inapplicable Rules

**Chapter 8**          **Bus. & Prof. Code § 6007(e): Failure to File a Response in a Disciplinary Proceeding; Termination**

Rule 5.250          Conditions for Involuntary Inactive Enrollment
Rule 5.251          Termination of Involuntary Inactive Enrollment
Rule 5.252          No Hearing Required
Rule 5.253          Applicable Rules

**Chapter 9**          **Bus. & Prof. Code § 6007(h): Interim Remedies**

Rule 5.255          Interim Remedies as Alternative to Involuntary Inactive Enrollment
Rule 5.256          Proceedings Seeking Interim Remedies Only
Rule 5.257          Application for Interim Remedies
Rule 5.258          Application Based Solely on Allegations under Business and Professions Code § 6007(b)(3)
Rule 5.259          Response
Rule 5.260          Stipulation

Rule 5.261            Hearing
Rule 5.262            Burden of Proof
Rule 5.263            Decision
Rule 5.264            Review
Rule 5.265            Inapplicable Rules


**Chapter 10**         **Change or Termination of Interim Remedies**

Rule 5.270            Scope
Rule 5.271            Filing and Service of Motion
Rule 5.272            Response
Rule 5.273            Stipulation
Rule 5.274            Hearing
Rule 5.275            Burden of Proof
Rule 5.276            Decision
Rule 5.277            Review
Rule 5.278            Inapplicable Rules


**DIVISION 5**         **PROBATION PROCEEDINGS**

**Chapter 1**          **Probation Modification and Early Termination Proceedings**

Rule 5.300            Motions for Modification or Early Termination of Probation
Rule 5.301            Stipulation to Modification or Early Termination of Probation
Rule 5.302            Burden of Proof; Discovery; Evidence
Rule 5.303            Ruling on Motion
Rule 5.304            Form of Ruling
Rule 5.305            Review
Rule 5.306            Inapplicable Rules


**Chapter 2**          **Probation Revocation Proceedings**

Rule 5.310            Probation Revocation Proceedings
Rule 5.311            Burden of Proof in Probation Revocation Proceedings; Expedited
                     Proceeding
Rule 5.312            Discipline Recommended in Probation Revocation Proceedings
Rule 5.313            Consolidation of Probation Revocation Proceedings
Rule 5.314            Conduct of Probation Revocation Proceedings
Rule 5.315            Involuntary Inactive Enrollment in Probation Matters
Rule 5.316            Review
Rule 5.317            Applicable Rules

**DIVISION 6**  **SPECIAL PROCEEDINGS**

**Chapter 1**  **Rule 9.20 Proceedings**

Rule 5.330  Nature of Proceeding
Rule 5.331  Definitions
Rule 5.332  Filing and Service of Declarations of Compliance
Rule 5.333  Time for Filing Proceeding Based on Untimely or Formally Defective Declaration
Rule 5.334  Notice of Disciplinary Charges; Initial Pleading
Rule 5.335  Response to Notice of Disciplinary Charges
Rule 5.336  Record
Rule 5.337  Expedited Proceeding; Limited Discovery

**Chapter 2**  **Conviction Proceedings**

Rule 5.340  Nature of Proceedings
Rule 5.341  Beginning Proceedings
Rule 5.342  Interim Suspension or Involuntary Inactive Enrollment
Rule 5.343  Summary Disbarment
Rule 5.344  Final Convictions
Rule 5.345  Hearing Department Proceedings
Rule 5.346  Defaults
Rule 5.347  Applicable Rules

**Chapter 3**  **Proceedings Based on Professional Misconduct in Another Jurisdiction**

Rule 5.350  Scope and Nature of Proceeding
Rule 5.351  How Commenced; Notice of Disciplinary Charges; Response
Rule 5.352  No Formal Discovery Except for Good Cause Shown
Rule 5.353  Record
Rule 5.354  Applicable Rules

**Chapter 4**  **Fee Arbitration Award Enforcement Proceedings**

Rule 5.360  Nature of Proceeding; Definitions
Rule 5.361  Initial Pleading; Service
Rule 5.362  Response; Failure to File Response; Amending or Supplementing Initial Pleading
Rule 5.363  Withdrawal of Motion
Rule 5.364  Request for Hearing; Waiver of Hearing
Rule 5.365  Burden of Proof
Rule 5.366  Discovery
Rule 5.367  Hearing Procedure; Evidence
Rule 5.368  Ruling on Motion; Costs
Rule 5.369  Review

Rule 5.370        Termination of Inactive Enrollment
Rule 5.371        Inapplicable Rules


**Chapter 5**        **Alternative Discipline Program**

Rule 5.380        Purpose of Program; Authority
Rule 5.381        Eligibility to Apply for Participation in Program
Rule 5.382        Acceptance for Participation in Program
Rule 5.383        Disqualification of Program Judge in Standard Proceeding
Rule 5.384        Disposition; Deferral of Imposition
Rule 5.385        Term of Participation in Program
Rule 5.386        Effect of Later Proceedings on Program Participation
Rule 5.387        Termination from Program
Rule 5.388        Confidentiality
Rule 5.389        Review


**Chapter 6**        **Legal Specialization Proceedings**

Rule 5.390        Scope
Rule 5.391        Beginning Proceeding; Time for Filing
Rule 5.392        Response to Application
Rule 5.393        Discovery
Rule 5.394        Issues Not Subject to Review
Rule 5.395        Hearing Procedure; Evidence
Rule 5.396        Burden of Proof
Rule 5.397        Review
Rule 5.398        Effect of State Bar Court Decision
Rule 5.399        Inapplicable Rules


**DIVISION 7**        **REGULATORY PROCEEDINGS**


**Chapter 1**        **Proceedings to Demonstrate Rehabilitation, Fitness, and Present
                     Learning and Ability in the Law according to Standard 1.2(c)(1)**

Rule 5.400        Scope and Expedited Nature of Proceeding
Rule 5.401        Petition for Relief from Actual Suspension
Rule 5.402        Earliest Time for Filing
Rule 5.403        Response; Request for Hearing
Rule 5.404        Burden of Proof
Rule 5.405        Discovery
Rule 5.406        Documentary Evidence
Rule 5.407        Testimonial Evidence
Rule 5.408        Decision
Rule 5.409        Review
Rule 5.410        Termination of Actual Suspension
Rule 5.411        Applicable Rules

**Chapter 2**          **Resignation Proceedings**

Rule 5.420        Resignation with Charges Pending
Rule 5.421        Perpetuation of Evidence
Rule 5.422        Notice of Intent to Perpetuate Evidence
Rule 5.423        Perpetuation Procedure
Rule 5.424        Report of Completion
Rule 5.425        Use of Perpetuated Evidence
Rule 5.426        Inapplicable Rules
Rule 5.427        Procedure for Consideration and Transmittal of Resignations with Disciplinary Charges Pending

**Chapter 3**          **Reinstatement Proceedings**

Rule 5.440        Beginning Proceeding
Rule 5.441        Filing Requirements
Rule 5.442        Earliest Time for Filing Reinstatement Petition
Rule 5.443        Investigation and Discovery
Rule 5.444        Notice of Hearing; Publication
Rule 5.445        Burden of Proof
Rule 5.446        Defaults
Rule 5.447        Applicable Rules

**Chapter 4**          **Moral Character Proceedings**

Rule 5.460        Scope
Rule 5.461        Beginning Proceeding; Time for Filing
Rule 5.462        Time to Complete Investigation; Response to Application
Rule 5.463        Discovery
Rule 5.464        Abatement of Proceeding
Rule 5.465        Effect of State Bar Court Decision
Rule 5.466        Inapplicable Rules

## TITLE III – GENERAL PROVISIONS

The rules in Title III were not included in the rule revisions adopted by the Board of Trustees effective January 1, 2011.  The rule numbers and language of Title III remain the same and will remain in effect in their current form.  To the extent any rule of procedure is referenced within Title III, that rule shall be applicable in its revised form.

**DIVISION I**         **STATE BAR COURT**

Rule 1000         State Bar Court
Rule 1001         Departments of the State Bar Court
Rule 1005         Oath
Rule 1010         Executive Committee
Rule 1011         Court Meetings
Rule 1013         Presiding Judge Duties
Rule 1014         Supervising Judge of the Hearing Department
Rule 1015         Adjudicatory Independence
Rule 1016         Administrative Functions

**DIVISION II**        **CHIEF TRIAL COUNSEL**

**Chapter 1**          **Chief Trial Counsel**

Rule 2101         Authority of the Office of Chief Trial Counsel

**Chapter 2**          **Special Deputy Trial Counsel**

Rule 2201         Appointment and Authority

**Chapter 3**          **Confidentiality**

Rule 2301         Records
Rule 2302         Disclosure of Information

**Chapter 4**          **Investigations**

Rule 2401         Purpose of Investigation
Rule 2402         Initiation of Inquiry or Investigation
Rule 2403         Complaint
Rule 2404         Communications Concerning the Conduct of Attorneys
Rule 2406         Effect of Communication to the State Bar
Rule 2407         Closure for Failure to Provide Assistance
Rule 2408         Effect of Restitution or Settlement; Unwillingness of Complainant to Proceed
Rule 2409         Attorney's Response to Allegations
Rule 2410         Communications with Current Clients of an Attorney

**Chapter 5**        **Subpoenas and Depositions**

Rule 2501        Forms for Subpoenas
Rule 2502        Investigation Depositions
Rule 2503        Trust Account Financial Records

**Chapter 6**        **Disposition of Inquiries, Complaints and Investigations**

Rule 2601        Closure of Inquiries, Complaints and Investigations
Rule 2602        Disposition by Admonition
Rule 2603        Reopening Inquiries, Investigations and Complaints
Rule 2604        Filing Notices of Disciplinary Charges
Rule 2605        Vexatious Complainants

**DIVISION III – OFFICE OF PROBATION**

Rule 2701        Office of Probation
Rule 2702        Duties of Probation Monitor Referees
Rule 2703        Confidentiality of Probation Files

**DIVISION IV – DISQUALIFICATION AND MCLE CREDIT**

**Chapter 1**        **Disqualification**

Rule 3101        Disqualification of Certain Persons

**Chapter 2**        **Minimum Continuing Legal Education Credit**

Rule 3201        Minimum Continuing Legal Education Credit

**DIVISION V – PROVISIONS APPLICABLE TO VARIOUS PROCEEDINGS**

**Chapter 1**        **Discipline Audit Panel**

**Chapter 2**        **Lawyer Referral Service Proceedings**

Rule 4201        Scope
Rule 4202        Beginning Proceeding; Time for Filing; Appearance by Counsel
Rule 4203        Response to Petition for Review
Rule 4204        Hearing Procedure
Rule 4205        Burden of Proof; Discovery; Evidence
Rule 4206        Review
Rule 4207        Effect of State Bar Court Decision
Rule 4208        Applicable Rules

**Chapter 3**         **Legal Services Trust Fund Proceedings**

Rule 4301         Nature of Proceedings
Rule 4302         Initiation of Proceedings
Rule 4303         Appearance by Counsel
Rule 4304         Applicable Rules

**Chapter 4**         **Rules for Administration of the State Bar Alternative Dispute Resolution Client-Attorney Mediation Program (ADRCAMP)**

Rule 4401         Authority
Rule 4402         Purpose of Program
Rule 4403         Standards to be Considered for ADRCAMP Referral
Rule 4404         Guidelines for Referral to ADRCAMP
Rule 4405         Post-Mediation Procedures – ADRCAMP
Rule 4406         Post-Mediation Procedures – Office of Chief Trial Counsel
Rule 4407         Materials

### TITLE IV – STANDARDS FOR ATTORNEY SANCTIONS
### FOR PROFESSIONAL MISCONDUCT

**Introduction**

**Part A**         **Standards in general**

Standard 1.1      Purposes and scope of standards
Standard 1.2      Definitions
Standard 1.3      Degrees of sanctions
Standard 1.4      Conditions attached to sanctions
Standard 1.5      Aggravating circumstances
Standard 1.6      Mitigating circumstances
Standard 1.7      Determination of appropriate sanctions
Standard 1.8      Effect of prior discipline

**Part B**         **Sanctions for specific misconduct**

Standard 2.1      Misappropriation
Standard 2.2      Commingling and other trust account violations
Standard 2.3      Illegal or unconscionable fee
Standard 2.4      Business transactions, pecuniary interests adverse to a client
Standard 2.5      Representation of adverse interests and conflicts of interest
Standard 2.6      Breach of confidentiality or misuse of confidential information
Standard 2.7      Performance, communication or withdrawal violations
Standard 2.8      Partnership or fee-splitting with non-lawyers
Standard 2.9      Frivolous litigation

Standard 2.10    Unauthorized practice of law
Standard 2.11    Moral turpitude, dishonesty, fraud, corruption, or concealment
Standard 2.12    Violation of oath or duties of an attorney
Standard 2.13    Sexual relations with clients
Standard 2.14    Violation of conditions attached to discipline
Standard 2.15    Criminal convictions involving moral turpitude
Standard 2.16    Criminal convictions not involving moral turpitude
Standard 2.17    Criminal conviction for specific misdemeanors
Standard 2.18    Violation of other Article 6 statutes
Standard 2.19    Violation of rules in general
Standard 2.20    Violation of a criminal act that reflects adversely on the lawyer's honesty
                 or fitness as a lawyer in other respects
Standard 2.21    Conduct prejudicial to the administration of justice

**TITLE IV.  STANDARDS FOR ATTORNEY SANCTIONS FOR PROFESSIONAL MISCONDUCT PART A.**

**STANDARDS IN GENERAL**

**1.1 PURPOSES AND SCOPE OF STANDARDS**

The Standards For Attorney Sanctions For Professional Misconduct (the "Standards") are adopted by the Board of Trustees to set forth a means for determining the appropriate disciplinary sanction in a particular case and to ensure consistency across cases dealing with similar misconduct and surrounding circumstances.  The Standards help fulfill the primary purposes of discipline, which include:

(a)    protection of the public, the courts and the legal profession;
(b)    maintenance of the highest professional standards; and
(c)    preservation of public confidence in the legal profession.

Rehabilitation can also be an objective in determining the appropriate sanction in a particular case, so long as it is consistent with the primary purposes of discipline.

The Standards are based on the State Bar Act, the published opinions of the Review Department of the State Bar Court, and the longstanding decisions of the California Supreme Court, which maintains inherent and plenary authority over the practice of law in California. Although not binding, the Standards are afforded great weight by the Supreme Court and should be followed whenever possible.  The Supreme Court will accept a disciplinary recommendation that is consistent with the Standards unless it has grave doubts about the propriety of the recommended sanction. If a recommendation is at the high end or low end of a Standard, an explanation must be given as to how the recommendation was reached.  Any disciplinary recommendation that deviates from the Standards must include clear reasons for the departure.

The Standards do not apply to: non-disciplinary dispositions such as admonitions and agreements in lieu of discipline; resignations; involuntary inactive enrollments; interim suspensions after conviction of a crime; or suspensions for nonpayment of State Bar fees, failure to comply with child support orders, or tax delinquencies.

Eff.  January 1, 1986.  Revised: January 1, 2007; January 1, 2014; July 1, 2015.

**1.2 DEFINITIONS**

(a)    "Lawyer" means a licensee of the California Supreme Court, the State Bar of California, or a person who is admitted in good standing and eligible to practice before the bar of any United States court or the highest court of the District of Columbia or any state, territory,  or insular possession of the United States, or is licensed to practice law in, or is admitted in good standing and eligible to practice before the bar of the highest court of, a foreign country or any political subdivision thereof and includes any agent of the lawyer, law firm, or law corporation doing business in the state.

(b) "Disbarment" is termination from the practice of law and from holding oneself out as entitled to practice law. The license issued by the Supreme Court or State Bar ceases and the licensee's name is stricken from the roll of attorneys.

(c) "Suspension" can include a period of actual suspension, stayed suspension, or both:

(1) "Actual suspension" is a disqualification from the practice of law and from holding oneself out as entitled to practice law, subject to probation and attached conditions. Actual suspension is generally for a period of thirty days, sixty days, ninety days, six months, one year, eighteen months, two years, three years, or until specific conditions are met. Actual suspension for two years or more requires proof, satisfactory to the State Bar Court, of rehabilitation, fitness to practice, and present learning and ability in the general law before a lawyer may be relieved of the actual suspension. The State Bar Court can require this showing in other appropriate cases as well.

(2) "Stayed suspension" is a stay of all or part of a suspension. Stayed suspension is generally for a period of at least one year. A suspension can be stayed only if it is consistent with the primary purposes of discipline.

(d) "Public Reproval" is a public censure or reprimand. A public reproval may include conditions.

(e) "Private Reproval" is a censure or reprimand that is not a matter of public record unless imposed after the initiation of formal disciplinary proceedings. A private reproval may include conditions.

(f) "Interim Remedies" are temporary restrictions imposed by the State Bar Court on a lawyer's ability to practice law. They are imposed in order to protect the public, the courts, and the legal profession until such time as the issues can be resolved through formal proceedings.

(g) "Prior record of discipline" is a previous imposition or recommendation of discipline. It includes all charges, stipulations, findings and decisions (final or not) reflecting or recommending discipline, including from another jurisdiction. It can be discipline imposed for a violation of a term of probation or a violation of a Supreme Court order requiring compliance with rule 9.20 of the California Rules of Court.

(h) "Aggravating circumstances" are factors surrounding a lawyer's misconduct that demonstrate that the primary purposes of discipline warrant a greater sanction than what is otherwise specified in a given Standard.

(i)     "Mitigating circumstances" are factors surrounding a lawyer's misconduct that demonstrate that the primary purposes of discipline warrant a more lenient sanction than what is otherwise specified in a given Standard.

(j)     "Probation" is a period of time under which a lawyer is subject to State Bar supervision. Probation may include conditions that further the primary purposes of discipline.

(k)     "Conditions" are terms with which a lawyer must comply as part of a disciplinary sanction. They relate to a lawyer's misconduct and the facts and circumstances surrounding the misconduct and serve the primary purposes of discipline.

(l)     "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

Eff.  January 1, 1986.  Revised: January 1, 2007; January 1, 2014; July 1, 2015; January 25, 2019.

## 1.3 DEGREES OF SANCTIONS

Subject to these Standards and the laws and rules governing the conduct of disciplinary proceedings, the following sanctions may be imposed upon a finding of misconduct:

(a)     disbarment;

(b)     actual suspension;

(c)     stayed suspension;

(d)     public reproval;

(e)     private reproval; or

(f)     any interim remedies or other final discipline authorized by the Business and Professions Code.

Eff. January 1, 1986. Revised:  January 1, 2014; July 1, 2015.

## 1.4 CONDITIONS ATTACHED TO SANCTIONS

Conditions attached to a reproval or probation may require a lawyer to:

(a)     make specific restitution or file a satisfaction of judgment;

## 1.7 DETERMINATION OF APPROPRIATE SANCTIONS

(a)     If a lawyer commits two or more acts of misconduct and the Standards specify different sanctions for each act, the most severe sanction must be imposed.

(b)     If aggravating circumstances are found, they should be considered alone and in balance with any mitigating circumstances, and if the net effect demonstrates that a greater sanction is needed to fulfill the primary purposes of discipline, it is appropriate to impose or recommend a greater sanction than what is otherwise specified in a given Standard. On balance, a greater sanction is appropriate in cases where there is serious harm to the client, the public, the legal system, or the profession and where the record demonstrates that the lawyer is unwilling or unable to conform to ethical responsibilities.

(c)     If mitigating circumstances are found, they should be considered alone and in balance with any aggravating circumstances, and if the net effect demonstrates that a lesser sanction is needed to fulfill the primary purposes of discipline, it is appropriate to impose or recommend a lesser sanction than what is otherwise specified in a given Standard.  On balance, a lesser sanction is appropriate in cases of minor misconduct, where there is little or no injury to a client, the public, the legal system, or the profession and where the record demonstrates that the lawyer is willing and has the ability to conform to ethical responsibilities in the future.

Eff.  January 1, 1986.  Revised: January 1, 2014; January 25, 2019.

## 1.8 EFFECT OF PRIOR DISCIPLINE

(a)     If a lawyer has a single prior record of discipline, the sanction must be greater than the previously imposed sanction unless the prior discipline was so remote in time and the previous misconduct was not serious enough that imposing greater discipline would be manifestly unjust.

(b)     If a lawyer has two or more prior records of discipline, disbarment is appropriate in the following circumstances, unless the most compelling mitigating circumstances clearly predominate or the misconduct underlying the prior discipline occurred during the same time period as the current misconduct:

    1.     Actual suspension was ordered in any one of the prior disciplinary matters;

    2.     The prior disciplinary matters coupled with the current record demonstrate a pattern of misconduct; or

    3.     The prior disciplinary matters coupled with the current record demonstrate the lawyer's unwillingness or inability to conform to ethical responsibilities.

(c)     Sanctions may be imposed, including disbarment, even if a lawyer has no prior record of discipline.

Eff. January 1, 2014; Revised: January 25, 2019.

## PART B. SANCTIONS FOR SPECIFIC MISCONDUCT [1]

The presumed sanction for any specific act of misconduct is a starting point for the imposition of discipline, but can be adjusted up or down depending on the application of mitigating and aggravating circumstances set forth in Standards 1.5 and 1.6, and the balancing of these circumstances as described in Standard 1.7(b) and (c). For any specific act of misconduct not listed in Part B, please refer to Standards 2.18 and 2.19.
Eff. July 1, 2015

### 2.1. MISAPPROPRIATION

(a)     Disbarment is the presumed sanction for intentional or dishonest misappropriation of entrusted funds or property, unless the amount misappropriated is insignificantly small or sufficiently compelling mitigating circumstances clearly predominate, in which case actual suspension is appropriate.

(b)     Actual suspension is the presumed sanction for misappropriation involving gross negligence.

(c)     Suspension or reproval is the presumed sanction for misappropriation that does not involve intentional misconduct or gross negligence.

Eff.  January 1, 1986.  Revised: January 1, 2014; July 1, 2015.

### 2.2 COMMINGLING AND OTHER TRUST ACCOUNT VIOLATIONS

(a)     Actual suspension of three months is the presumed sanction for (1) commingling, (2) failure to deposit funds received for a client or other person to whom the lawyer owes a contractual, statutory, or other legal duty, including advances for fees, costs and expenses, in a client trust account when that conduct does not involve misappropriation, or (3) failure to promptly pay out entrusted funds.

(b)     Suspension or reproval is the presumed sanction for any other violation of rule 1.15 of the Rules of Professional Conduct including, but not limited to violations of 1.15(d).

Eff.  January 1, 1986.  Revised: January 1, 2001; January 1, 2014; July 1, 2015; May 17, 2019.

### 2.3 ILLEGAL OR UNCONSCIONABLE FEE

---

[1] The term "reproval" includes public or private reproval.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


IN RE: 3M COMBAT ARMS EARPLUG      )      Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,     )
                                   )      Pensacola, Florida
                                   )      April 9, 2021
                                   )      8:10 a.m.
_____)


VOLUME IX
(Pages 1 to 323)


TRANSCRIPT OF NINTH DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury


**A P P E A R A N C E S**


**FOR THE PLAINTIFFS:**      Aylstock, Witkin, Kreis & Overholtz, PLLC
                             By:  **BRYAN F. AYLSTOCK**
                                  _baylstock@awkolaw.com_

                                  **NEIL D. OVERHOLTZ**
                                  _noverholtz@awkolaw.com_

                                  **JENNIFER HOEKSTRA**
                                  _jhoekstra@awkolaw.com_

                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502

_Donna L. Boland, RPR, FCRR_
_United States Court Reporter_
_1 N Palafox Street * Pensacola, Florida  32502_
**_Donna_Boland@flnd.uscourts.gov_**

**A-34**

**APPEARANCES**:   (Cont'd)

**FOR THE PLAINTIFFS**:   Laminack, Pirtle & Martines LLP
By: **THOMAS W. PIRTLE**
    *tomp@lmp-triallaw.com*
5020 Montrose Blvd, 9th Floor
Houston, Texas  77006

Pulaski Kherkher, PLLC
By:  **KATHERINE CORNELL**
2925 Richmond Avenue, Suite 1725
Houston, Texas  77098


**FOR THE DEFENDANTS**:   Kirkland & Ellis, LLP
By:  **ROBERT C. BROCK**
    *mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C.  20004

Kirkland & Ellis, LLP
By:  **NICHOLAS F. WASDIN**
    *nick.wasdin@kirkland.com*

    **MARK J. NOMELLINI**
    *mnomellini@kirkland.com*
300 N Lasalle
Chicago, Illinois   60654

Dechert, LLP
By: **KIMBERLY BRANSCOME**
    *kimberly.branscome@dechert.com*
633 W 5th Street, Suite 4900
Los Angeles, California  90071

Moore, Hill & Westmoreland, PA
By: **CHARLES F. BEALL, JR.**
    *cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
*Donna_Boland@flnd.uscourts.gov*

**A-35**

| | | |
|---|---|---|
| 12:18:10 | 1 | think it's very bad. |
| 12:18:14 | 2 | **THE COURT:**  Let's say 1:30, just in case the weather |
| 12:18:17 | 3 | is bad, and it may be difficult for you getting back.  So we'll |
| 12:18:21 | 4 | make it 1:30.  See you back at that time.  Thank you. |
| 12:18:25 | 5 | *(Jury out.)* |
| 12:18:44 | 6 | Dr. Arriaga, you're back up at 1:30. |
| 12:18:47 | 7 | **THE WITNESS:**  Yes, ma'am. |
| 12:18:48 | 8 | **THE COURT:**  We'll see you then. |
| 12:18:50 | 9 | Anything from anyone? |
| 12:18:52 | 10 | **MS. BRANSCOME:**  I do, Your Honor, but I think it's |
| 12:18:53 | 11 | better if Dr. Arriaga -- |
| 12:18:55 | 12 | **THE COURT:**  Dr. Arriaga, if you would, please exit the |
| 12:18:57 | 13 | courtroom for this discussion.  Thank you.  Since you are the |
| 12:18:59 | 14 | witness on the stand. |
| 12:19:00 | 15 | (Dr. Arriaga excused from the courtroom.) |
| 12:19:10 | 16 | Everyone else can be seated, if you'd like. |
| 12:19:14 | 17 | Ms. Branscome? |
| 12:19:15 | 18 | **MS. BRANSCOME:**  Yes, Your Honor.  I wanted to raise an |
| 12:19:17 | 19 | issue about a document I would like to use with Dr. Arriaga on |
| 12:19:20 | 20 | cross, but I know it has been the subject of some discussion, |
| 12:19:23 | 21 | but not a ruling at this point. |
| 12:19:26 | 22 | Given Dr. Arriaga's somewhat lengthy testimony about |
| 12:19:30 | 23 | all of the various REAT testing, Dr. Arriaga actually, in his |
| 12:19:35 | 24 | expert report, discusses the testing that was performed by |
| 12:19:38 | 25 | Michael & Associates.  It is the exact same methodology as the |

**A-36**

12:19:44    1    testing of the 015 and 017 tests, and there is no indication

12:19:48    2    that any of the flanges were folded back.

12:19:50    3              There has been a ruling that Dr. Michael cannot

12:19:54    4    testify, but there has actually not been a ruling on the test

12:19:57    5    results themselves.

12:20:00    6              I can impeach Dr. Arriaga even just with his expert

12:20:03    7    report.  He actually discusses it.  He talks about the NRR

12:20:06    8    level in that testing.  I would prefer to be able to use the

12:20:09    9    test documents themselves, which are also obviously on his

12:20:12   10    reliance list and discussed in his report.  But I understand

12:20:16   11    that this has been a complicated issue that we've been

12:20:18   12    discussing.  So I thought it was fair to raise rather than just

12:20:21   13    try to do it on the fly.

12:20:23   14              THE COURT:  I'll hear from Mr. Cartmell, but I think

12:20:26   15    the problem is going to be the test results themselves.  I

12:20:31   16    mean, that was -- that was the issue that I recall was the big

12:20:34   17    issue, was whether you were going to get an agreement from the

12:20:38   18    plaintiffs about the admissibility, the authenticity of those

12:20:42   19    studies, and -- let me finish, because I may be wrong, and you

12:20:46   20    can correct me if I'm wrong -- but they didn't agree to that,

12:20:50   21    and then you missed the deadline to identify him as a witness,

12:20:53   22    and so he's out and the documents are out.  That's my

12:20:57   23    understanding of where we left it.

12:20:59   24              MS. BRANSCOME:  The issue, Your Honor -- so your

12:21:01   25    understanding of the situation with respect to Kevin Michael's

**A-37**

| | |
|---|---|
| 12:21:04 | 1 |
| 12:21:07 | 2 |
| 12:21:10 | 3 |
| 12:21:12 | 4 |
| 12:21:15 | 5 |
| 12:21:19 | 6 |
| 12:21:23 | 7 |
| 12:21:26 | 8 |
| 12:21:31 | 9 |

1  deposition is accurate.  There was a discussion of could we

2  forego the deposition in exchange for a stipulation.  But I

3  don't think that entire situation means that the documents

4  themselves are inadmissible.  First of all, experts can rely on

5  hearsay.  There is no issue about the authenticity of the

6  testing themselves.  And when an expert discusses the testing,

7  and he, you know, acknowledges that that is another NRR test in

8  which a 23 was obtained, it's part of his materials considered

9  and something that he didn't present to the jury.

10          **THE COURT:**  Why am I just hearing about this now?  You

11  recognized that it's very controversial, and why wasn't this

12  something that I was made aware of?  You knew he was going to

13  testify today.  Why was I not made aware of this before right

14  now?

15          **MS. BRANSCOME:**  Frankly, Your Honor, I -- and I will

16  be completely candid, Your Honor -- I thought they would really

17  keep Dr. Arriaga to being a medical expert in Mr. Hacker's

18  case.  They already put on Rich McKinley.  He did not have the

19  same discussion of the Michael's testing in his report, and I

20  ended up crossing him on other issues.

21          It was when, not only was an hour-and-a-half spent

22  yesterday, but -- and even yesterday, I thought I could let it

23  lie.  But today, I mean, it was another full hour.  And, Your

24  Honor, I raised the cumulative issue, but it went on for a very

25  long time.

**A-38**

| | | |
|---|---|---|
| 12:22:22 | 1 | And for this expert's credibility, I mean, he went |
| 12:22:25 | 2 | through, and he said the NRR value from those labeling tests |
| 12:22:30 | 3 | are the things that matter to him; and he also testified that |
| 12:22:34 | 4 | it is his view that the 017 test had all of the flanges folded |
| 12:22:39 | 5 | back; and the Michael's testing, there is no indication |
| 12:22:42 | 6 | anyone's flanges were folded back, and it got an NRR of 23.  So |
| 12:22:46 | 7 | it's a direct response to the direct examination that was |
| 12:22:49 | 8 | conducted of Dr. Arriaga today. |
| 12:22:51 | 9 | THE COURT:  Let me hear from the plaintiffs. |
| 12:22:53 | 10 | MR. CARTMELL:  I was just going to say, you know, one, |
| 12:22:56 | 11 | you know, we thought it was out.  I may have talked about that, |
| 12:22:59 | 12 | because now we have evidence that in fact, you know, certain |
| 12:23:02 | 13 | people were thrown out from that study, we now know.  And, you |
| 12:23:08 | 14 | know, that's -- it was out of the case.  I don't think that |
| 12:23:11 | 15 | it's fair now for her to cross-examine him on it, when he |
| 12:23:16 | 16 | didn't have a chance to address it up front; that in fact that |
| 12:23:19 | 17 | study is no good because of the information we have and we |
| 12:23:22 | 18 | relied on that. |
| 12:23:23 | 19 | As far as this cumulative thing, this keeps coming up. |
| 12:23:27 | 20 | Rich McKinley was not a doctor.  He can't diagnose, he can't |
| 12:23:31 | 21 | put it in ears and figure from a doctor's -- |
| 12:23:34 | 22 | THE COURT:  I overruled the cumulative objection as to |
| 12:23:37 | 23 | Dr. Arriaga. |
| 12:23:38 | 24 | MR. AYLSTOCK:  Your Honor, just to address the |
| 12:23:42 | 25 | Michael's thing specifically, it was my recollection that we |

**A-39**

12:23:43    1    were arguing about the document, and you determined that there

12:23:46    2    was no foundation, and we certainly objected on foundation.  I

12:23:50    3    could be wrong, so -- but that was -- we certainly had a

12:23:53    4    discussion about the documents themselves.  We do object on

12:23:56    5    foundation.  There is no foundation for this document.

12:23:59    6          Of course, any expert is supposed to consider

12:24:02    7    anything.  So, in fact, had he not considered something, I'm

12:24:07    8    sure there would been a *Daubert* challenge, aha, you didn't

12:24:12    9    consider that.  But there is no foundation laid.  It was not

12:24:15    10   disclosed, it's not on the exhibit list, and it wasn't brought

12:24:18    11   up on direct, and Your Honor has already ruled on it.

12:24:21    12         **MS. BRANSCOME:**  But I could impeach with just the

12:24:24    13   expert report.  I don't actually need the documents.  He talks

12:24:27    14   about it in his expert report.  Those are statements that are

12:24:30    15   fair game to impeach an expert with, if they present a bunch of

12:24:33    16   evidence and don't acknowledge inconsistent evidence that's

12:24:36    17   discussed on multiple pages in his report.

12:24:39    18         **THE COURT:**  Well, you might be able to do that, but

12:24:41    19   that's different than admitting the testing that I thought was

12:24:44    20   out.

12:24:45    21         **MS. BRANSCOME:**  That's why I wanted to raise it, Your

12:24:47    22   Honor, is I can do it through impeachment, but I certainly

12:24:51    23   didn't want to do it through impeachment and then we have a

12:24:54    24   whole -- I think the impeachment is totally fair game.  We

12:24:56    25   looked through our records.  We do not think an order has been

12:24:59  1    entered on the exhibits themselves.  So that's why I was

12:25:03  2    raising it, Your Honor.  And however Your Honor would like me

12:25:05  3    to handle it, I can.  But I think at a bare minimum,

12:25:08  4    impeachment is appropriate.

12:25:09  5         THE COURT:  Well, the exhibits are out.  I mean,

12:25:14  6    that's where we left it.  And I would have wanted some, I

12:25:20  7    guess, motion for reconsideration or something on that, because

12:25:25  8    that's where we were.  You all wanted to identify him as a

12:25:29  9    witness.  I didn't allow you to do that.  But then we had this

12:25:33  10   big discussion about the exhibits.  And I can pull up the

12:25:36  11   transcript.  I don't know that I entered an order after that,

12:25:39  12   but I know that I left that discussion thinking those exhibits

12:25:43  13   were no longer an issue, for me anyway, at trial.

12:25:49  14        MS. BRANSCOME:  And that's why I'm raising it, Your

12:25:51  15   Honor, is that I have not found an order actually on the

12:25:55  16   exhibits.  They weren't submitted by -- there was a compilation

12:26:00  17   submitted by the plaintiffs that's overly complicated.  So

12:26:03  18   there wasn't actually an order to seek reconsideration, but I

12:26:07  19   was sensitive to the fact that we obviously had had significant

12:26:10  20   discussions of this.  I can impeach Dr. Arriaga with his

12:26:14  21   report, if Your Honor is now entering the ruling on the

12:26:16  22   exhibits.

12:26:17  23        THE COURT:  Do we have on the exhibit list these

12:26:23  24   studies, on the defendants' exhibit list, and an objection?

12:26:29  25        MS. BRANSCOME:  It's actually on both, Your Honor.

**A-41**

12:26:32   1   There is a defense version of it and a plaintiffs' version of

12:26:33   2   it.

12:26:33   3         **THE COURT:**  I think I've looked at this.  I want to

12:26:35   4   say I looked at this, and it was in my mind there wasn't a

12:26:41   5   foundation for it, the doctor wasn't going to be able to

12:26:43   6   testify, and it was just, again, it was a nonissue for me.

12:26:48   7         Unless you can find an order or a statement by me in a

12:26:52   8   transcript that somehow has led you to believe those were still

12:26:57   9   fair game, which it sounds like not, because you're bringing it

12:27:01   10  up as you are, but if you find something during lunch, I'll

12:27:04   11  talk to you about it, but for now I'm leaving it at, you can

12:27:08   12  impeach him with his report, and then you can deal with it on

12:27:11   13  redirect.  I would not allow the exhibits in -- the testing in

12:27:16   14  without something more.

12:27:18   15        **MR. CARTMELL:**  I understand your ruling.  I just,

12:27:20   16  thinking ahead with Dr. House, he relies on PTSD a lot, and

12:27:26   17  anxiety causing the tinnitus and things.  It seems to me, when

12:27:30   18  evidence is out, you can't impeach with it.  But if that's fair

12:27:35   19  game, then --

12:27:37   20        **THE COURT:**  It will be fair game.  If they think they

12:27:41   21  can impeach with the report, then you certainly will be able to

12:27:45   22  impeach their expert witnesses with their reports, if you can.

12:27:49   23        **MS. BRANSCOME:**  Well, let me seek clarification.  Is

12:27:52   24  Mr. Cartmell suggesting that somehow reports override motions

12:27:55   25  in limine and orders, because there is no order?

Moises Arriaga - Direct/Cartmell                    163

| 12:27:57 | 1 | **THE COURT:** Well, that's the same thing we're talking |
| 12:27:59 | 2 | about here. In my mind, I have excluded those tests. So, you |
| 12:28:05 | 3 | just said you accepted that, but you felt that the impeachment |
| 12:28:08 | 4 | from the report was fair game. |
| 12:28:10 | 5 | **MS. BRANSCOME:** Just to be clear, I need to be very |
| 12:28:13 | 6 | clear for the record. I do not believe there is an order on |
| 12:28:17 | 7 | D-GEN- I think it's -- |
| 12:28:18 | 8 | **THE COURT:** I'll give you one right now. |
| 12:28:20 | 9 | **MS. BRANSCOME:** That's fine, Your Honor. |
| 12:28:22 | 10 | **THE COURT:** The objection to D-GEN, whatever it is, |
| 12:28:25 | 11 | that is Kevin Michael's testing results, the objection is |
| 12:28:27 | 12 | sustained. |
| 12:28:29 | 13 | **MS. BRANSCOME:** Understood. And I understand |
| 12:28:30 | 14 | procedurally what that means. Once there is an order in place, |
| 12:28:34 | 15 | I wouldn't try to circumvent it with impeachment. We just |
| 12:28:38 | 16 | never found -- there was not actually a ruling on D-GEN- |
| 12:28:41 | 17 | **THE COURT:** Did anyone send D-GEN, whatever it is, to |
| 12:28:44 | 18 | me and say, "Judge, I need a ruling on this"? |
| 12:28:46 | 19 | **MS. BRANSCOME:** No. And I'm accepting that. That |
| 12:28:49 | 20 | came from today's direct, Your Honor. |
| 12:28:51 | 21 | **THE COURT:** All right. Well, you all decide how you |
| 12:28:53 | 22 | want to deal with the impeachment with the report, because |
| 12:28:56 | 23 | what's good for one side is going to be good for the other. |
| 12:28:58 | 24 | But the studies are out. |
| 12:29:01 | 25 | **MR. AYLSTOCK:** Thank you, Your Honor. |

**A-43**

| | | |
|---|---|---|
| 05:27:33 | 1 | Oh, I'm sorry, Dr. Arriaga, you can go.  I am so |
| 05:27:37 | 2 | sorry.  I forget he was still sitting in the witness stand. |
| 05:27:41 | 3 | *(Witness excused.)* |
| 05:27:42 | 4 | Look at what you have left in terms of witnesses and |
| 05:27:46 | 5 | just begin to think about finishing.  There will need to be |
| 05:27:50 | 6 | some notice to the defense as far as when they're going to |
| 05:27:53 | 7 | start.  I'm not saying that's got to be right now. |
| 05:27:56 | 8 | **MR. AYLSTOCK:**  We look at it every day, I would say |
| 05:27:58 | 9 | probably eight times a day, and we're very cognizant that we |
| 05:28:02 | 10 | have to reserve some time for cross-examination, or their case |
| 05:28:07 | 11 | is going to be a lot better than ours. |
| 05:28:09 | 12 | **THE COURT:**  Okay.  All right.  We'll leave it at that. |
| 05:28:15 | 13 | Everybody look at the time over the weekend.  And if we need |
| 05:28:17 | 14 | to, we can discuss it again on Monday. |
| 05:28:19 | 15 | Anything else? |
| 05:28:20 | 16 | *[No response.]* |
| 05:28:21 | 17 | Okay.  Well, y'all have a nice weekend.  I'll see you |
| 05:28:25 | 18 | on Monday at eight. |
| | 19 | ***(Proceedings concluded at 5:38 p.m.)*** |
| | 20 | -------------------- |
| | 21 | *I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Any* |
| | 22 | *redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.* |
| | 23 | |
| | 24 | |
| | 25 | *s/Donna L. Boland*                          *4-9-2021* |
| | | *Donna L. Boland, RPR, FCRR*                 *Date* |
| | | *Official Court Reporter* |

**A-44**

```
 1                              INDEX

 2

 3      WITNESS FOR THE PLAINTIFFS:                        PAGE

 4
        MOISES ARRIAGA
 5           DIRECT EXAMINATION CONTINUED BY MR. CARTMELL..... 11
             CROSS-EXAMINATION BY MS. BRANSCOME............... 164
 6

 7                    *   *   *   *   *   *   *   *

 8                              EXHIBITS

 9
        NO.:                DESCRIPTION
10
        DDH-1               Photographs                        252
11
        S-HACKER-0001       Medical Records: Deployment Health  113
12                          Clinic (SRC) re S. Hacker, dated
                            04/26/2011
13
        S-HACKER-0002       Duke University Health Systems      273
14                          Medical Records for Stephen
                            Hacker, dated 9/11/2015
15
        S-HACKER-0005       Hearing Conservation Data (DD Form  212
16                          2216E) re S. Hacker (Doc ID:
                            810668), dated 07/06/2007
17
        S-HACKER-0006       Reference Audiogram (DD Form        208
18                          2215E) re S. Hacker (Doc ID:
                            810670), dated 03/09/2006
19
        S-HACKER-0007       Hearing Conservation Data (DD Form  218
20                          2216E) re S. Hacker (Doc ID:
                            810672), dated 10/09/2013
21
        S-HACKER-0008       Hearing Conservation Data (DD Form  208
22                          2216E) re S. Hacker (Doc ID:
                            810676), dated 02/11/2004
23
        S-HACKER-0009       Hearing Conservation Data (DD Form  221
24                          2216E) re S. Hacker (Doc ID:
                            810678), dated 04/13/2018
25
```

**A-45**

| | | | |
|---|---|---|---|
| 1 | S-HACKER-0010 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810679), dated 02/15/2007 | 209 |
| 3 | S-HACKER-0011 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810681), dated 08/17/2012 | 217 |
| 5 | S-HACKER-0012 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810683), dated 07/17/2017 | 220 |
| 7 | S-HACKER-0013 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810684), dated 03/17/2011 | 216 |
| 9 | S-HACKER-0014 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810685), available 11/18/2002 | 206 |
| 11 | S-HACKER-0015 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810686), dated 06/19/2007 | 210 |
| 13 | S-HACKER-0016 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810687), dated 08/24/2009 | 212 |
| 15 | S-HACKER-0017 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810688), dated 02/26/2015 | 219 |
| 17 | S-HACKER-0018 | Reference Audiogram (DD Form 2215E) re S. Hacker (Doc ID: 810691), dated 04/28/2015 | 219 |
| 19 | S-HACKER-0019 | Reference Audiogram (DD Form 2215E) re S. Hacker (Doc ID: 810692), dated 01/28/2010 | 215 |
| 21 | S-HACKER-0020 | Hearing Conservation Data (DD Form 2216E) re S. Hacker (Doc ID: 810693), dated 03/31/2016 | 220 |
| 23 | S-HACKER-0027 | Medical Record: 31 Mar 2017 at WAMC, AMH M02A JHC Red by Moore, Clint J, dated 3/31/2017 | 111 |

**A-46**

| 1 | S-HACKER-0028 | Medical Record: 02 Mar 2010 at Evans ACH Ft Carson, CO Otolaryngology by Bruns, Alan D, dated 3/2/2010 | 100 |
| 2 | | | |
| 3 | | | |
| 4 | S-HACKER-0029 | Medical Record: 28 Jan 2010 Evans ACH Ft Carson, CO, Audiology by Soennecken, Anna C, dated 1/28/2010 | 102 |
| 5 | | | |
| 6 | S-HACKER-0030 | Report of Medical Exam, dated 1/26/1998 | 69 |
| 7 | | | |
| 8 | S-HACKER-0034 | Medical Record: 22 Jan 2010 at Evans ACH Ft Carson, CO, Otolaryngology by Bruns, Alan D, dated 1/22/2010 | 97 |
| 9 | | | |
| 10 | P-GEN-00050 | EAR Memo re Results of Short-Stemmed UltraFit Plug Tests [DEMONSTRATIVE] | 9 |
| 11 | | | |
| 12 | S-GEN-0066 | Report: Monthly Report, EPA-Supervised S3.19(1974) Testing, 04/2015 | 9 |
| 13 | | | |
| 14 | P-GEN-00092 | EARCAL CAEv2 Unsigned Attenuation Test Data (Closed - 213030) | 9 |
| 15 | | EARCAL CAEv2 Unsigned Attenuation Test Data (Closed - 213030) | 39 |
| 16 | | | |
| 17 | S-GEN-0111 | Email from A. Shaver re Design Meeting Memo | 9 |
| 18 | | | |
| 19 | D-HACKER-0118 | Photograph: Plaintiff Stephen Hacker's ESI Production - Hacker_Facebook_Prod002 - Attachment, dated 07/29/2020 | 227 |
| 20 | | | |
| 21 | D-GEN-0243 | Instructional Guide: EAR Combat Arms Earplugs | 233 |
| 22 | | | |
| 23 | P-GEN-00257 | September Monthly Report | 9 |
| 24 | P-GEN-00349 | Berger (1999) So, How Do You Want Your NRRs - Realistic Or Sunny Side Up? Article | 9 |
| 25 | | | |

**A-47**

| P-GEN-00359 | Email attaching Bubble Sheets and CAEv2 Project Summary Sheet | 9 |
| D-GEN-0365 | Sail the Sound 29th Annual NHCA Hearing Conservation Conference February 19-21, 2004 | 261 |
| P-GEN-00384 | EARCAL Attenuation Test Report | 30 |
| D-HACKER-0387 | Medical Record: 31 Aug 2009 at Blachfield ACH, Fort Campbell, KY, Army Hearing Program by Leccese, Melissa M, dated 8/31/2009 | 213 |
| P-GEN-00433 | Cover email - performance reviews for Kieper & Kladden | 9 |
| P-GEN-00452 | Annotations from EAR Checklist with Assessment Annotations and NVLAP General Operations Checklist | 9 |
| D-GEN-0565 | Sail the Sound 29th Annual NHCA Hearing Conservation Conference February 19-21, 2004 | 246 |
| D-GEN-0567 | Reference Audiogram (DD Form 2215) | 203 |
| D-GEN-0568 | Hearing Conservation Data (DD Form 2216) | 201 |
| P-GEN-00653 | Aearo CAEv1 and CAEv2 Brochure (Colored) | 9 |
| P-GEN-00654 | | 9 |
| P-GEN-00739 | 215007 HPDA Report Screen shot | 9 |
| P-GEN-00744 | 215511 HPDA Report Screen shot | 9 |
| P-GEN-00809 | 215515 HPDA Report Screen shot | 9 |
| P-GEN-01140 | Kieper Email re Stopping customEAR Labeling Test | 9 |
| P-GEN-01468 | Thread re Missing Closed Position Testing for ATM-Produced CAEv4 | 9 |
| P-GEN-01593 | Kieper and Throndsen re NRR for H9P3E-02 Food Service Muff Is Low | 9 |

**A-48**

| 1 | D-GEN-1689 | Packaging: Combat Arms Earplugs Instructions;Combat Arms Earplugs More than a Hearing Protector Instructions | 235 |
|---|---|---|---|
| 2 | P-GEN-02268 | 3M PSD Release Specification Form - UltraFit with Through Hole | 9 |
| 5 | P-GEN-02457 | Thread re Madison Edits to Impulse Noise Warning Label | 9 |
| 7 | P-HACKER-12091 | Ft. Campbell Audiology | 87 |
| 8 | P-HACKER-12108R | Airborne Determination | 94 |
| 9 | P-HACKER-12130 | Evans ACH Outpatient Appointment | 90 |
| 10 | P-HACKER-12143 | Duke Health Surgery | 72 |
| 11 | P-HACKER-12178 | Photo Hacker in Uniform | 142 |
| 12 | P-HACKER-12206 | Report of Medical History | 96 |
| 13 | P-HACKER-12208 | Blanchfield ACH - Army Hearing Program, Leccese, Melissa | 134 |

* * * * * * * *

**A-49**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                  )   Pensacola, Florida
                                  )   April 27, 2021
                                  )   7:46 A.M.
_____)

VOLUME XXI
(Pages 1 to 398)

TRANSCRIPT OF TWENTY-FIRST DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury

**A P P E A R A N C E S**

**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
                      By:  **BRYAN F. AYLSTOCK**
                           *baylstock@awkolaw.com*

                           **NEIL D. OVERHOLTZ**
                           *noverholtz@awkolaw.com*

                           **JENNIFER HOEKSTRA**
                           *jhoekstra@awkolaw.com*

                      17 E Main Street, Suite 200
                      Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
*Donna_Boland@flnd.uscourts.gov*

A-50

**APPEARANCES:**   (Cont'd)

**FOR THE PLAINTIFFS:**       Laminack, Pirtle & Martines LLP
                          By: **THOMAS W. PIRTLE**
                              *tomp@lmp-triallaw.com*
                          5020 Montrose Blvd, 9th Floor
                          Houston, Texas   77006

                          Pulaski Kherkher, PLLC
                          By:  **KATHERINE CORNELL**
                          2925 Richmond Avenue, Suite 1725
                          Houston, Texas   77098


**FOR THE DEFENDANTS:**       Kirkland & Ellis, LLP
                          By:  **ROBERT C. BROCK**
                              *mike.brock@kirkland.com*
                          1301 Pennsylvania Avenue NW
                          Washington, D.C.   20004

                          Kirkland & Ellis, LLP
                          By:  **NICHOLAS F. WASDIN**
                              *nick.wasdin@kirkland.com*

                              **MARK J. NOMELLINI**
                              *mnomellini@kirkland.com*
                          300 N Lasalle
                          Chicago, Illinois    60654

                          Dechert, LLP
                          By: **KIMBERLY BRANSCOME**
                              *kimberly.branscome@dechert.com*
                          633 W 5th Street, Suite 4900
                          Los Angeles, California  90071

                          Moore, Hill & Westmoreland, PA
                          By: **CHARLES F. BEALL, JR.**
                              *cbeall@mhw-law.com*
                          350 W Cedar Street, Suite 100
                          Pensacola, Florida   32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A-51**

|  |  |  |
|---|---|---|

| | 1 | *P R O C E E D I N G S* |
| | 2 | (*Call to Order of the Court.*) |
| 07:37:32 | 3 | (*Parties present; jury not present.*) |
| 07:46:29 | 4 | **THE COURT:**  Good morning. |
| 07:46:31 | 5 | **MR. AYLSTOCK:**  Good morning, Judge. |
| 07:46:32 | 6 | **THE COURT:**  So what I want to ask first, is there any |
| 07:46:36 | 7 | issue with regard to any of the witnesses this morning? |
| 07:46:40 | 8 | **MR. WASDIN:**  Your Honor, Dr. Casali, we may play a |
| 07:46:45 | 9 | tape, but I think Dr. Casali would be this morning so the issue |
| 07:46:50 | 10 | with respect to his slide is for a witness this morning. |
| 07:46:55 | 11 | **THE COURT:**  Okay.  What's the issue? |
| 07:46:56 | 12 | **MR. AYLSTOCK:**  The issue is related to Slide 13. |
| 07:46:58 | 13 | There is a reference to the Kevin Michael study which Your |
| 07:47:04 | 14 | Honor has excluded repeatedly. |
| 07:47:06 | 15 | **THE COURT:**  Well, I didn't exclude it from expert |
| 07:47:08 | 16 | testimony.  Is it on his reliance list? |
| 07:47:11 | 17 | **MR. AYLSTOCK:**  It's on his reliance list in the same |
| 07:47:13 | 18 | way that all of our experts needed to consider it, but as Your |
| 07:47:16 | 19 | Honor recalls there was an issue with regard to the foundation |
| 07:47:18 | 20 | of this study. |
| 07:47:19 | 21 | **THE COURT:**  Yeah, but all expert reliance materials |
| 07:47:26 | 22 | have been fair game in this trial, and I've told the jury over |
| 07:47:28 | 23 | and over again, it's hearsay, you can't consider it for the |
| 07:47:31 | 24 | truth, you can consider that the witness did or didn't rely on |
| 07:47:35 | 25 | it when you evaluate the witness's opinion.  But I never |

**A-52**

07:47:37   1   excluded this from an expert standpoint.  The study is not

07:47:41   2   coming in.  And I wouldn't allow you all, Mr. Wasdin, to show

07:47:46   3   the study.  You can -- I saw the slide.  That's fine, but

07:47:54   4   nothing else.

07:47:55   5        You can cross him on it, Mr. Aylstock, if you wish.

07:47:58   6   If you do that, I might let a bar graph up or a chart or

07:48:01   7   something, but I'm not going to let in the study.

07:48:04   8        **MR. AYLSTOCK:**  The problem, Your Honor, is with regard

07:48:06   9   to cross-examination of our experts, you did exclude the

07:48:09  10   reference to that and our experts --

07:48:11  11        **THE COURT:**  Reference to what?

07:48:12  12        **MR. AYLSTOCK:**  The Michael study, and our case just --

07:48:17  13        **THE COURT:**  Wait.  Are you telling me you had experts

07:48:19  14   that relied on that study that wanted to discuss the study in

07:48:23  15   terms of their opinions?

07:48:26  16        **MR. AYLSTOCK:**  No, Your Honor.  They needed to

07:48:28  17   consider it because an expert needs to consider all the

07:48:30  18   evidence.  They considered it, they determined it to be

07:48:32  19   unreliable for various reasons, and so they rejected the study.

07:48:36  20   We didn't bring it up.  But as I recall, the defense sought to

07:48:39  21   bring it up during our cross-examination of our experts or at

07:48:43  22   least that was a suggestion.

07:48:44  23        **THE COURT:**  I don't recall that, but it may have

07:48:47  24   happened.  It's been a long trial.  I just don't have any

07:48:50  25   specific recollection of it.

| | | |
|---|---|---|
| 07:48:51 | 1 | **MR. AYLSTOCK:**  I totally agree with that, and I don't |
| 07:48:53 | 2 | want to overstate what I know to be true.  But I do believe |
| 07:48:56 | 3 | that, had we known that this was going to be an issue, we would |
| 07:49:00 | 4 | have been able to have our experts address it and explain how |
| 07:49:04 | 5 | in fact it's unreliable and so forth.  And now for it to be |
| 07:49:08 | 6 | virtually the last day of trial, we're not going to have the |
| 07:49:11 | 7 | opportunity to deal with the study other than -- |
| 07:49:14 | 8 | **THE COURT:**  You know this has been a basis for |
| 07:49:18 | 9 | Dr. Casali's opinion since he gave his opinion. |
| 07:49:23 | 10 | **MR. AYLSTOCK:**  I don't think, while an expert can rely |
| 07:49:25 | 11 | upon hearsay, I don't think they can rely upon a document that |
| 07:49:28 | 12 | has been specifically excluded because it lacks foundation by |
| 07:49:31 | 13 | this Court.  And that was the finding of this Court, that this |
| 07:49:34 | 14 | has no foundation, they can't lay the foundation -- |
| 07:49:37 | 15 | **THE COURT:**  It has no foundation for admission is what |
| 07:49:40 | 16 | I ruled.  So no one could admit that document into evidence. |
| 07:49:45 | 17 | The jury is not going to see that study, and I'm going to tell |
| 07:49:50 | 18 | them that they can't consider the truth of the study.  They |
| 07:49:56 | 19 | cannot consider the truth of the facts asserted in that study, |
| 07:50:02 | 20 | and that's the same with all of the expert reliance material. |
| 07:50:06 | 21 | **MR. WASDIN:**  But they could of course consider |
| 07:50:10 | 22 | Dr. Casali's opinions that were based on the study.  That's why |
| 07:50:14 | 23 | he's here to testify. |
| 07:50:14 | 24 | **THE COURT:**  They can evaluate his opinion and the fact |
| 07:50:18 | 25 | that he relied on a study or didn't rely on a study.  And you |

07:50:21   1   can certainly cross him, Mr. Aylstock, or whomever has this

07:50:27   2   witness, on the unreliability of the study.  That's all I can

07:50:32   3   -- this issue was never raised with me specific to an expert.

07:50:37   4   I mean, the study, no question, is out, but no one asked me

07:50:41   5   about whether an expert's reliance on it, you know, whether

07:50:45   6   that would be fair game at trial.

07:50:47   7            MR. AYLSTOCK:  We would request then Your Honor to

07:50:49   8   give that instruction that it can't be relied upon for the

07:50:51   9   truth.

07:50:52  10            THE COURT:  Well, I have, I will.  I've done it with

07:50:55  11   -- I've tried to do it with every piece of literature that --

07:51:00  12   although we've had some experts certainly who have relied on

07:51:04  13   studies that are in evidence, and that's different.  They're

07:51:07  14   government documents, they're public records, whatever, but

07:51:10  15   that's not this document.

07:51:14  16            MR. WASDIN:  Thank you, Your Honor.

07:51:14  17            THE COURT:  What else?

07:51:15  18            MR. WASDIN:  That's it for Dr. Casali this morning.

07:51:18  19            MS. BRANSCOME:  Your Honor, I have an issue that I

07:51:21  20   need to raise in follow-up to yesterday.

07:51:25  21            As Your Honor is well aware, the technical maintenance

07:51:30  22   guide for the M1A2 tank information was provided to the Court,

07:51:35  23   at least I infer, over the weekend about the origin of that

07:51:38  24   document.  We were not provided with that information until Dr.

07:51:42  25   Flamme was actually on the stand.  And so, last night, we were

John Casali - Direct/Wasdin                    130

11:05:13   1    **A.**   Yes.

11:05:13   2    **Q.**   Let's talk about -- well, let me ask you:

11:05:16   3    In addition to Aearo's testing, 015, 017, have you reviewed

11:05:21   4    a lot of other REAT testing that was done on the Combat Arms

11:05:24   5    Version 2 by private and government agencies?

11:05:27   6    **A.**   Yes.

11:05:29   7    **Q.**   Aearo's testing, this labeling testing, that was done to

11:05:35   8    what's called the ANSI S3.19 standard; is that right?

11:05:41   9    **A.**   Yes.

11:05:41   10   **Q.**   That's the standard you have to use when you're labeling a

11:05:43   11   product, right?

11:05:44   12   **A.**   Correct.

11:05:44   13   **Q.**   Have you looked at any other ANSI S3.19 testing that's been

11:05:49   14   done on the Combat Arms Version 2?

11:05:51   15   **A.**   Yes.

11:05:51   16   **Q.**   What testing was that?

11:05:52   17   **A.**   There was a test run by Michael & Associates Lab, which was

11:06:01   18   an S3.19 test.

11:06:03   19   **Q.**   Who is Kevin Michael?

11:06:06   20   **A.**   Kevin Michael is the owner of Michael & Associates.  He has

11:06:12   21   a doctorate in communication sciences, I believe.  He has a

11:06:16   22   laboratory for a lot of different aspects of hearing

11:06:20   23   protection, testing and evaluation, one of which is S3.19

11:06:24   24   testing for labeling purposes, and he does a large number of

11:06:28   25   those tests.  As a laboratory that's an independent lab, but

**A-56**

| | | |
|---|---|---|
| 11:06:33 | 1 | it's a commercial lab, it's his lab.  And his father started |
| 11:06:37 | 2 | that lab many, many years ago at Penn State, and I think it |
| 11:06:42 | 3 | eventually moved off campus and Kevin runs it. |
| 11:06:46 | 4 | **THE COURT:**  Mr. Wasdin, just a minute. |
| 11:06:47 | 5 | Ladies and gentlemen, just so you're aware, the |
| 11:06:49 | 6 | Michael study is not in evidence in this trial, it's hearsay. |
| 11:06:54 | 7 | But as you're aware, you've been instructed previously with |
| 11:06:57 | 8 | other experts, experts are permitted to rely on hearsay in |
| 11:07:00 | 9 | reaching their opinions.  But because the Michael study is |
| 11:07:03 | 10 | hearsay, you cannot consider the study for the truth of the |
| 11:07:07 | 11 | study results.  However, you can consider Dr. Casali's reliance |
| 11:07:11 | 12 | on it when you evaluate his opinion. |
| 11:07:16 | 13 | **BY MR. WASDIN:** |
| 11:07:16 | 14 | **Q.**   Is Kevin Michael on any of the ANSI committees? |
| 11:07:19 | 15 | **A.**   Yes, he's active on those committees. |
| 11:07:21 | 16 | **Q.**   Have you ever been to his laboratory? |
| 11:07:23 | 17 | **A.**   Yes. |
| 11:07:23 | 18 | **Q.**   When did you go there? |
| 11:07:25 | 19 | **A.**   It's been a number of years, probably eight or ten years |
| 11:07:32 | 20 | ago. |
| 11:07:32 | 21 | **Q.**   Is his lab NVLAP accredited? |
| 11:07:36 | 22 | **A.**   I looked at his manual, and it does indicate that he has |
| 11:07:39 | 23 | NVLAP accreditation. |
| 11:07:41 | 24 | **Q.**   You've actually reviewed his policy and procedures manual |
| 11:07:44 | 25 | for testing? |

11:07:45   1   **A.**   I read it.  I looked at it, yes.

11:07:47   2   **Q.**   Have you reviewed test reports from his laboratory outside

11:07:50   3   of this case?

11:07:51   4   **A.**   I've seen test reports from Kevin Michael's lab on a few

11:08:01   5   occasions that are independent of this case; and of course it's

11:08:04   6   a small community of people, I know him well.

11:08:07   7   **Q.**   Does he do a lot of REAT testing there at the lab?

11:08:10   8   **A.**   It's my impression that he does by far the majority of the

11:08:14   9   S3.19 labeling tests, certainly not all of them, but he does a

11:08:19   10   large number of them for various manufacturers.

11:08:21   11   **Q.**   Do you remember -- I hate to put you on the spot here, if

11:08:23   12   you don't remember, that's okay, but -- do you remember when he

11:08:24   13   tested the Combat Arms plug?

11:08:27   14   **A.**   I don't remember the exact year, but I think it was

11:08:32   15   probably four or five years ago.  I don't remember the date.

11:08:35   16   **Q.**   Sometime before this case?

11:08:41   17   **A.**   Well before this case.

11:08:43   18       **MR. WASDIN:**   Donnie, let's pull up Slide 34.

11:08:46   19   **BY MR. WASDIN:**

11:08:47   20   **Q.**   Can you walk the jury through how Kevin Michael's testing

11:08:51   21   of the Combat Arms Version 2 under the exact same standard that

11:08:55   22   Aearo tested it under agrees with Aearo's testing?

11:08:58   23   **A.**   Yes.  So, over here in the legend, both tests were run with

11:09:05   24   experimenter fit, and that's what's required.  And these are

11:09:09   25   the average values, the mean values.  And of course we have

| | | |
|---|---|---|
| 11:09:12 | 1 | frequency from low pitches of sound to high pitches of sound on |
| 11:09:15 | 2 | this horizontal axis.  And these graphs are inverted on the |
| 11:09:19 | 3 | scale.  What we have here is further down is more attenuation, |
| 11:09:29 | 4 | better protection as we go down. |
| 11:09:31 | 5 | And Michael is in the blue and Aearo/3M is in the red, and |
| 11:09:36 | 6 | the values, obviously, are overlapping at some points and |
| 11:09:40 | 7 | fairly close at all points.  In my opinion, it's a good |
| 11:09:46 | 8 | agreement between the two labs. |
| 11:09:48 | 9 | Q.   Now, these data that are plotted here that you're saying |
| 11:09:52 | 10 | have good agreement, those are the mean attenuation data, |
| 11:09:55 | 11 | right? |
| 11:09:55 | 12 | A.   They are. |
| 11:09:55 | 13 | Q.   Did Michael go ahead and calculate an NRR for the product |
| 11:09:59 | 14 | based on his ten-subject data? |
| 11:10:02 | 15 | A.   He did.  And the NRR is a complex calculation, so it |
| 11:10:05 | 16 | involves standard deviations, which aren't shown here, and he |
| 11:10:10 | 17 | used that to calculate an NRR, yes. |
| 11:10:12 | 18 | Q.   Do you remember how his NRR compared to Aearo's NRR on the |
| 11:10:16 | 19 | label for the green end? |
| 11:10:17 | 20 | A.   Well, Aearo's NRR from the 017 test was 22 and Michael's |
| 11:10:23 | 21 | NRR from this test was 23. |
| 11:10:25 | 22 | Q.   He got a higher NRR? |
| 11:10:27 | 23 | A.   Well, it's very similar.  23 is close to 22. |
| 11:10:33 | 24 | Q.   Now, he also tested the yellow end, right? |
| 11:10:35 | 25 | A.   He did. |

| | | |
|---|---|---|
| 06:36:30 | 1 | been referring to a document that's not in the record, and I |
| 06:36:33 | 2 | just wanted to make sure -- |
| 06:36:34 | 3 | **THE COURT:**  Sometimes there are -- it's not going to |
| 06:36:37 | 4 | be in this case, but sometimes there are countless iterations |
| 06:36:42 | 5 | of drafts of proposed instructions, and I'm not about to cloud |
| 06:36:48 | 6 | the record with all that.  That's my ruling.  I guess if the |
| 06:36:55 | 7 | Eleventh Circuit disagrees with it one day, they'll let me |
| 06:36:58 | 8 | know. |
| 06:36:58 | 9 | Anything else before we reconvene tomorrow morning to |
| 06:37:07 | 10 | talk about Kentucky law? |
| 06:37:09 | 11 | **MR. SACCHET:**  Thank you for your time. |
| 06:37:11 | 12 | **THE COURT:**  Thank you.  I will get back with you on |
| 06:37:14 | 13 | rulings on what's still outstanding.  I appreciate your |
| 06:37:16 | 14 | concessions on those instructions you have agreed to and made |
| 06:37:23 | 15 | it easier on us. |
| 06:37:25 | 16 | All right.  So, 7:15 tomorrow morning. |
| 06:37:28 | 17 | **MR. SACCHET:**  We'll be here. |
| 06:37:29 | 18 | **THE COURT:**  See you then.  Good night. |
| | 19 | *(Proceedings concluded at 6:37 p.m.)* |
| | 20 | -------------------- |
| | 21 | *I certify that the foregoing is a correct transcript from the* |
| | 22 | *record of proceedings in the above-entitled matter.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.* |
| | 23 | |
| | 24 | *s/Donna L. Boland*                    *4-27-2021* <br> *Donna L. Boland, RPR, FCRR*            *Date* <br> *Official Court Reporter* |
| | 25 | |

**A-60**

```
 1                              INDEX

 2

 3   WITNESSES FOR THE DEFENDANTS:                        PAGE

 4
```

```
 5     HARRI KYTOMAA
           CROSS-EXAMINATION CONTINUED BY MR. OVERHOLTZ..... 14
           REDIRECT EXAMINATION BY MR. WASDIN.............. 49
 6
       LEWIS KEEFER BY VIDEOTAPED DEPOSITION
 7         EXAMINATION..................................... 63

 8     JOHN GORDON CASALI
           DIRECT EXAMINATION BY MR. WASDIN................ 74
 9         CROSS-EXAMINATION BY MR. CARTMELL............... 158
           REDIRECT EXAMINATION BY MR. WASDIN.............. 233
10
       WILLIAM MURPHY BY VIDEOTAPED DEPOSITION
11         EXAMINATION..................................... 241

12     KATHY GATES BY VIDEOTAPED DEPOSITION
           EXAMINATION..................................... 245
13
       ERIC FALLON
14         DIRECT EXAMINATION BY MR. WASDIN................ 269
```

```
15                      *   *   *   *   *   *   *   *

16
```

```
17   JURY INSTRUCTION CONFERENCE                          331
```

```
18

19                              EXHIBITS

20
```

```
21     NO.:                 DESCRIPTION                   PAGE

22   P-GEN-00081   Kieper to EARCal and TJR re Comparing    54
                   ARC Box Measurements
23
     D-GEN-0107    Roll-up of sales by year (Exhibit A)     61
24
     P-GEN-00125   Klun Email attaching Berger T6 Div      172
25                 Scientist Proposal
```

**A-61**

| 1 | P-GEN-01134 | Hamer to Michaels re New Technical Director and Discontinuing Testing if Not Attaining the Expected NRR | 224 |
|---|---|---|---|
| 3 | D-GEN-1139 | Presentation: Hearing Protection Devices | 268 |
| 5 | D-GEN-1731 | Spreadsheet: E-A-RCAL Attenuation Test Report, Per Ansi S12.6-1997, Test ID 213029 - UltraFit Plug w/ cord, dated 06/27/2006 | 146 |
| 7 | D-GEN-1759 | Email from R. Kieper to A. Haapapuro re follow-up from Mexico, Attachment: CombatArms1.xls, dated 11/30/2004 | 55 |
| 9 | P-GEN-02436 | Email from Ravi Thomas to Hamer and Berger re ARC testing | 43 |
| 11 | P-GEN-02438 | Charlie Myers re theory behind ARC testing | 39 |

```
1
2
3
4
5
6
7
8
9
10
11
12
13              *   *   *   *   *   *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

**A-62**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                               )    Pensacola, Florida
    *McCombs v. 3M Company*     )    May 26, 2021
    *Case No. 7:20cv0094*        )    7:36 a.m.
                               )
_____)


## VOLUME VIII
### (Pages 1 to 343)

TRANSCRIPT OF EIGHTH DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury


## **A P P E A R A N C E S**


**FOR THE PLAINTIFF:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
                        By:  **NEIL D. OVERHOLTZ**
                              *noverholtz@awkolaw.com*

                              **JENNIFER HOEKSTRA**
                              *jhoekstra@awkolaw.com*

                        17 E Main Street, Suite 200
                        Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*1 N Palafox Street * Pensacola, Florida  32502*
*Donna_Boland@flnd.uscourts.gov*

A-63

1    __APPEARANCES__:   (Cont'd)

2    __FOR THE PLAINTIFF:__       Monsour Law Firm
                                 By:  __DOUGLAS C. MONSOUR__
3                                     *dougmonsourlawfirm.com*
                                 404 N Green Street
4                                 Longview, Texas  75601

5                                 Heninger, Garrison, Davis, LLC
                                 By:  __W. LEWIS GARRISON, JR.__
6                                     *lewis@hgdlawfirm.com*
                                 2224 1st Avenue North
7                                 Birmingham, Alabama  35203

8                                 Gibbs Law Group, LLP
                                 By: __ANDRE M. MURA__
9                                     *amm@classlawgroup.com*
                                 505 14th Street, Suite 1110
10                                Oakland, California  94612

11   __FOR THE DEFENDANTS:__      Kirkland & Ellis, LLP
                                 By:  __ROBERT C. BROCK__
12                                    *mike.brock@kirkland.com*
                                 1301 Pennsylvania Avenue NW
13                                Washington, D.C.  20004

14                                Kirkland & Ellis, LLP
                                 By:  __MARK J. NOMELLINI__
15                                    *mnomellini@kirkland.com*

16                                    __HARIKLIA ("Carrie") KARIS__
                                     *hkaris@kirkland.com*
17                                300 N Lasalle
                                 Chicago, Illinois  60654
18
                                 Moore, Hill & Westmoreland, PA
19                                By: __CHARLES F. BEALL, JR.__
                                     *cbeall@mhw-law.com*
20                                350 W Cedar Street, Suite 100
                                 Pensacola, Florida  32502
21
                                 Kirkland & Ellis, LLP
22                                By:  __SIERRA ELIZABETH__
                                     *sierra.elizabeth@kirkland.com*
23                                555 South Flower Street, Suite 3700
                                 Los Angeles, California  90071

24

25

**A-64**

07:43:52    1       **THE COURT:**  That's what I just asked, and what I'm

07:43:55    2    told is yes.  I haven't been through all of Dr. Murphy's -- if

07:44:01    3    it's not, then this is not proper response to the McKinley

07:44:09    4    testimony.

07:44:10    5       Mr. Nomellini, was the slide shown to Dr. Murphy?

07:44:15    6       **MR. NOMELLINI:**  Your Honor, we can -- I can confirm

07:44:17    7    that.  Clearly he's being asked about the slide here, there's

07:44:23    8    no question, the question is about the slide.

07:44:25    9       **THE COURT:**  Let's do this because I've got a jury in

07:44:28   10    15 minutes.  You all need to get confirmation on that and point

07:44:34   11    me to where it is in the transcript, or I can ask Ms. Dang to

07:44:38   12    look at it as well, and I'll have to get back with you on this.

07:44:44   13       **MR. NOMELLINI:**  Happy to do that, Your Honor.  Thank

07:44:47   14    you.

07:44:47   15       **THE COURT:**  All right.  There's also an issue as I

07:44:50   16    understand with regards to I believe it's Dr. Casali's

07:44:53   17    testimony and slide show or slide PowerPoint presentation

07:44:56   18    regarding the Michael testing I think; is that right?

07:44:59   19       **MS. HOEKSTRA:**  Yes, Your Honor.  If you don't mind,

07:45:06   20    I'm going to put this on the ELMO as well.  I'm sure you've

07:45:10   21    seen this slide before.

07:45:11   22       **THE COURT:**  Right.

07:45:13   23       **MS. HOEKSTRA:**  It was used previously.  There was an

07:45:15   24    order specifically issued in Baker because of a motion in

07:45:17   25    limine, there was an order specifically issued in EHK.  We just

| 07:45:21 | 1 | are making the record here that we're objecting to the use of |
| 07:45:25 | 2 | the Michael data.  Because the data and documents themselves |
| 07:45:27 | 3 | have been excluded, we don't think it's a proper reference to |
| 07:45:31 | 4 | have it on the slide. |
| 07:45:33 | 5 | THE COURT:  Right.  Well, I -- I said in my order in |
| 07:45:35 | 6 | Baker that this could be discussed with an expert.  I'll give |
| 07:45:35 | 7 | the jury an instruction that it can't be considered for the |
| 07:45:39 | 8 | truth. |
| 07:45:39 | 9 | MS. HOEKSTRA:  That's fine, Your Honor.  I feel like |
| 07:45:41 | 10 | I'm playing the role of Charles Beall.  We're just making a |
| 07:45:46 | 11 | record on this for the McCombs case. |
| 07:45:47 | 12 | THE COURT:  All right. |
| 07:45:47 | 13 | MR. BEALL:  And doing it very well, by the way.  Thank |
| 07:45:51 | 14 | you. |
| 07:45:51 | 15 | THE COURT:  All right, record made and overruled. |
| 07:46:01 | 16 | Nothing with Dr. Kytomaa? |
| 07:46:03 | 17 | MS. HOEKSTRA:  Correct, we resolved that. |
| 07:46:08 | 18 | THE COURT:  What else, Mr. Bartlett? |
| 07:46:12 | 19 | MR. BARTLETT:  Your Honor, one other thing we |
| 07:46:14 | 20 | discussed last night, and that's the Dr. Donaldson's deposition |
| 07:46:17 | 21 | testimony. |
| 07:46:17 | 22 | THE COURT:  Right. |
| 07:46:18 | 23 | MR. BARTLETT:  I understand Your Honor's ruling |
| 07:46:20 | 24 | before.  It's just we went back through the record and it's a |
| 07:46:23 | 25 | little unclear to us.  We are taking the position that -- |

03:55:09  1      **MS. KARIS:**  And if we can now go to .3, if we can look

03:55:16  2  at the top, please, call out the comments.

03:55:16  3  **BY MS. KARIS:**

03:55:18  4  **Q.**   This test report that was sent to Mark Little with the

03:55:22  5  completed test of 213017, can you tell us what the comments say

03:55:30  6  that went along with this report?

03:55:32  7  **A.**   Well, to read the comments, "Plugs are the green end of the

03:55:39  8  Combat Arms plug.  The yellow flanges were folded outward to

03:55:43  9  allow deeper insertion of the green plug.  G.W.G. failed the

03:55:50  10  Extreme Range Test.  He was retested.  The original NRR was

03:55:55  11  21."

03:55:55  12  **Q.**   Okay.  And so, does this support your opinion or view that

03:56:03  13  the completed test with the instruction for folding back the

03:56:09  14  flange to allow for deeper insertion if it was needed was

03:56:13  15  conveyed to the U.S. military?

03:56:17  16  **A.**   I'm sorry.  I didn't hear the last part of your question.

03:56:20  17  **Q.**   That this was sent over to the military along with the plug

03:56:24  18  after the 017 test.  Let me rephrase it.  It may have gotten

03:56:33  19  lost in there.  I apologize, Dr. Casali.

03:56:35  20      The report that we're looking at that went with the letter

03:56:38  21  to Major Mark Little, does this report contain the instruction

03:56:45  22  for folding back the flange if needed for deeper insertion?

03:56:49  23  **A.**   It does.  Major Mark Little I believe was at NIOSH at the

03:56:57  24  time.

03:56:57  25  **Q.**   Let's move on to another subject.

03:57:03  1      Are you familiar with testing that was conducted by Michael

03:57:10  2  & Associates lab in connection with the Combat Arms Earplug

03:57:14  3  Version 2?

03:57:14  4  **A.**   Yes, I'm very familiar with that laboratory, Dr. Michael,

03:57:19  5  and that test.

03:57:20  6  **Q.**   And have you relied on that test in connection with

03:57:22  7  reaching your opinions in this case?

03:57:24  8  **A.**   Yes, I dealt with that test in my report.

03:57:27  9  **Q.**   Tell us about that test.  What was the relevance of that

03:57:30  10  test, first of all, to your opinions?

03:57:34  11      **THE COURT:**  So before Dr. Casali does that, ladies and

03:57:35  12  gentlemen, let me give you an instruction regarding this

03:57:38  13  testing by the Michael Lab.

03:57:41  14      That testing is hearsay, so you may not consider it

03:57:44  15  for the truth of what the test results show, but you can

03:57:48  16  consider the fact that Dr. Casali relied on it in his opinion

03:57:51  17  and you can consider that in evaluating his opinion.

03:57:54  18  **BY MS. KARIS:**

03:57:55  19  **Q.**   Dr. Casali, tell us what your familiarity is, first of all,

03:58:00  20  with the Michael testing?

03:58:01  21  **A.**   So my familiarity with it was:  It was run according to

03:58:06  22  S3.19-1974, experimenter-fit, as we've been talking about here,

03:58:11  23  10 subjects, three trials each, providing the necessary data to

03:58:15  24  establish a label.

03:58:16  25      The other thing I'm aware of -- and one of the reasons I

03:58:22  1    focused on that and dealt with it in my report was it was the

03:58:27  2    only other test at that time of the Combat Arms green end

03:58:30  3    according to the prevailing required test standard, again,

03:58:36  4    S3.19 experimenter-fit.

03:58:40  5            **MS. KARIS:**  If we can pull up Slide 34, please.

03:58:46  6    **BY MS. KARIS:**

03:58:47  7    **Q.**   By the way, was Kevin Michael on any ANSI committees, to

03:58:51  8    your knowledge?

03:58:51  9    **A.**   Kevin Michael is active on the ANSI standard committees,

03:58:58  10   again, S12.6 committee.

03:59:00  11   **Q.**   And have you known Mr. Michael for multiple years?

03:59:04  12   **A.**   I've known Kevin Michael for 30-plus years, and his father

03:59:10  13   Paul ran the laboratory.  The laboratory is at Penn State back

03:59:16  14   in those years, and I had met his father as well.

03:59:19  15   **Q.**   I think you said this, but was the Michael testing that you

03:59:21  16   relied on in connection with your opinions, was that an S3.19,

03:59:27  17   experimenter-fit test?

03:59:30  18   **A.**   Correct.

03:59:30  19   **Q.**   All right.  Tell the jury what we see here in this graph

03:59:35  20   that is on Slide 34 of Demonstrative 14.

03:59:43  21   **A.**   So the Michael data obviously in blue and the Aearo/3M data

03:59:48  22   in red.  Both of these are on the green end.  This is a test of

03:59:51  23   the type that's required for labeling.

03:59:54  24           And of course, the axes that we have, the horizontal axis,

04:00:03  25   is the pitch of the sound or the frequency from low to high,

**A-69**

05:42:50  1    prior three cases.

05:42:54  2              Anything else?

05:42:55  3              *[No response.]*

05:42:56  4              All right.  Then I'll see at least Mr. Mura and Mr.

05:43:01  5    Beall at 7:30 and everyone else certainly by eight.  Good

05:43:05  6    night.

        7                    ***(Proceedings concluded at 5:43 p.m.)***

        8                         --------------------

        9    *I certify that the foregoing is a correct transcript from the*
             *record of proceedings in the above-entitled matter.  Any*
       10    *redaction of personal data identifiers pursuant to the Judicial*
             *Conference Policy on Privacy are noted within the transcript.*
       11

       12
             ***s/Donna L. Boland***                           ***5-26-2021***
       13    ***Donna L. Boland, RPR, FCRR***                  ***Date***
             ***Official Court Reporter***
       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1                              *INDEX*

2

3   *WITNESSES FOR THE DEFENDANTS:*                    *PAGE*

4

    **JOHN MERKLEY VIA VIDEOTAPED DEPOSITION**
5          EXAMINATION.....................................23

6   **MARK SANTORO VIA VIDEOTAPED DEPOSITION**
           EXAMINATION.....................................49
7
    **DEREK ANTHONY JONES**
8          DIRECT EXAMINATION BY MS. KARIS..................56
           CROSS-EXAMINATION BY MR. GARRISON...............118
9          REDIRECT EXAMINATION BY MS. KARIS...............153

10  **KASIDY PUTNEY VIA VIDEOTAPED DEPOSITION**
           EXAMINATION....................................157
11
    **BRIAN HOBBS VIA VIDEOTAPED DEPOSITION**
12         EXAMINATION....................................164

13  **JOHN GORDON CASALI**
           DIRECT EXAMINATION BY MS. KARIS.................184
14         CROSS-EXAMINATION BY MR. MONSOUR...............298

15                  *   *   *   *   *   *   *   *

16

17                           EXHIBITS

18
      NO.:              DESCRIPTION                    PAGE
19
    S-GEN-0003      Report: Department of Defense        182
20                  Instruction, Number 6055.12,
                    Subject: DoD Hearing Conservation
21                  Program (HCP), dated 04/22/1996

22  D-MCCOMBS-0024  Medical Records from Marshall        109
                    Health, dated 12/30/2020
23
    D-GEN-0118      USACHPPM Just the Facts…The Combat   182
24                  Arms Earplug

25

| | | |
|---|---|---|
| 1<br>2 | D-GEN-0150 | Report: EARCAL Impulse Peak Attenuation Test Report, Per Ansi S12.42-2010, dated 7/22/2015 | 291 |
| 3<br>4 | D-GEN-0162 | Report: 3M Impulse Peak Insertion Loss Test Report, Per Ansi/ASA S12.42-2010, dated 7/22/2015 | 291 |
| 5<br>6<br>7 | D-MCCOMBS-0166 | Medical Records: FR-Virtual Behavioral Health re Dustin McCombs, dated 03/19/2010. | 101 |
| 8 | D-MCCOMBS-0181 | Audiometer Test Results re Dustin McCombs, dated 02/27/2008. | 78 |
| 9<br>10 | D-MCCOMBS-0193 | OEF/OIF Transition Patent Advocate Note | 104 |
| 11<br>12<br>13 | D-GEN-0246 | Report: J. DeSpirito, M. Binseel, Modeling of Acoustic Pressure Waves in Level-Dependent Earplugs, Army Research Laboratory, Aberdeen Proving Ground, MD. ARL-TR-4607, dated 09/2008 | 293 |
| 14<br>15 | P-GEN-00526 | Klun, Knauer (2003) Aearo Company Product Development Process HPD | 333 |
| 16<br>17<br>18<br>19 | D-GEN-0802 | Report: Assessment of Four Passive Hearing Protection Devices for Continuous Noise Attenuation, Impulsive Noise Insertion Loss, and Auditory Localization Performance. (USAARL Report No. 2015-01), R. Williams, J.R. Stefanson, et al., dated 11/17/2014. | 280 |
| 20<br>21<br>22 | D-GEN-1476 | Report: Wideband Hearing, Intelligibility, and Sound Protection (WHISPr), B. Hobbs, D. Hudson, M. King, R. McKinley, D. Brungart, dated October 2008 | 182 |
| 23<br>24<br>25 | D-GEN-1501 | Memorandum: Department of Defense Instruction re DoD Instruction re DoD Hearing Conservation Program (HCP), dated 4/22/1996 | 182 |

| | | | |
|---|---|---|---|
| 1 | D-GEN-1502 | Hearing Conservation Program Medical Services, dated 12/10/1998 | 182 |
| 2 | | | |
| | D-GEN-1505 | Agenda DoD Hearing Conservation Working Group Meeting, dated 4/9/1998 | 182 |
| 3 | | | |
| 4 | | | |
| | D-GEN-1506 | Email from D. Ohlin to D. Ohlin re Letter for Combat Arms earplug, dated 4/9/1999 | 182 |
| 5 | | | |
| 6 | | | |
| | D-GEN-1507 | Report: ARL-HRED Hearing Protection Device Assessments in Reverberating Environments, Dr. J. Kalb, G. Garinther, M. Golden, Dr. R. Price | 182 |
| 7 | | | |
| 8 | | | |
| 9 | D-GEN-1508 | Memorandum for Staff Director, Joint Readiness Clinical Advisory Board re Request for National Stock Number (NSN) and Bulk Purchase of Combat Arms Earplug | 182 |
| 10 | | | |
| 11 | | | |
| 12 | D-GEN-1509 | Memorandum for Staff Director, Joint Readiness Clinical Advisory Board re Request for National Stock Number (NSN) and Bulk Purchase of Combat Arms Earplug | 182 |
| 13 | | | |
| 14 | | | |
| 15 | D-GEN-1516 | Medical Records: Hearing Conservation Data (DD 2216 Form) and Section 845 Prototype Agreement | 182 |
| 16 | | | |
| 17 | P-GEN-01962 | AFRL Hearing Protector Evaluation Report - Closed End | 279 |
| 18 | | | |
| 19 | | | |
| 20 | | * * * * * * * * | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS EARPLUG )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION, )
                               )     Pensacola, Florida
    *McCombs v. 3M Company*        )     MAY 28, 2021
    *Case No. 7:20cv0094*          )     7:40 a.m.
                               )
_____)


VOLUME X
(Pages 1 to 162)

TRANSCRIPT OF TENTH DAY OF JURY TRIAL
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE, and a jury


# A P P E A R A N C E S

**FOR THE PLAINTIFF:**      Aylstock, Witkin, Kreis & Overholtz, PLLC
                          By:  **NEIL D. OVERHOLTZ**
                               *noverholtz@awkolaw.com*

                               **JENNIFER HOEKSTRA**
                               *jhoekstra@awkolaw.com*

                          17 E Main Street, Suite 200
                          Pensacola, Florida  32502

| | | |
|---|---|---|
| 1 | **APPEARANCES:** (Cont'd) | |

**FOR THE PLAINTIFF:**   Monsour Law Firm
By:   **DOUGLAS C. MONSOUR**
      *dougmonsourlawfirm.com*

      **KATHARINE KROTTINGER**
      *katy@monsourlawfirm.com*
404 N Green Street
Longview, Texas   75601

Heninger, Garrison, Davis, LLC
By:  **W. LEWIS GARRISON, JR.**
     *lewis@hgdlawfirm.com*
2224 1st Avenue North
Birmingham, Alabama   35203

Gibbs Law Group, LLP
By: **ANDRE M. MURA**
     *amm@classlawgroup.com*
505 14th Street, Suite 1110
Oakland, California   94612

**FOR THE DEFENDANTS:**   Kirkland & Ellis, LLP
By:   **ROBERT C. BROCK**
      *mike.brock@kirkland.com*
1301 Pennsylvania Avenue NW
Washington, D.C.   20004

Kirkland & Ellis, LLP
By:   **MARK J. NOMELLINI**
      *mnomellini@kirkland.com*

      **HARIKLIA ("Carrie") KARIS**
      *hkaris@kirkland.com*
300 N Lasalle
Chicago, Illinois   60654

Moore, Hill & Westmoreland, PA
By: **CHARLES F. BEALL, JR.**
     *cbeall@mhw-law.com*
350 W Cedar Street, Suite 100
Pensacola, Florida   32502

Kirkland & Ellis, LLP
By:   **SIERRA ELIZABETH**
      *sierra.elizabeth@kirkland.com*
555 South Flower Street, Suite 3700
Los Angeles, California  90071

11:29:25    1          Now, what you didn't see even once from the plaintiffs

11:29:31    2    in this case is any testing performed by the government, any

11:29:38    3    testing performed by their experts, any testing performed by

11:29:44    4    anyone they could have hired that tested this product and

11:29:49    5    concluded the product didn't work.  Quite the opposite.

11:29:55    6          Every government study showed the product worked.  You

11:29:59    7    heard Dr. Casali who says he's worked with this product for

11:30:05    8    decades.  You heard about work he's done with it.  You even

11:30:09    9    heard from Mr. McKinley, the plaintiff's expert.  When he

11:30:13   10    tested it outside of this litigation, that product worked.

11:30:17   11          So when we say why does the product work, it's because

11:30:22   12    of the overwhelming evidence, scientific, data-driven evidence

11:30:28   13    that shows that the product was tested and it worked.

11:30:32   14          And I just put a slide up here.  This is Mr.

11:30:35   15    McKinley's study.  You saw Brian Hobbs, the lead presenter of

11:30:40   16    that study, you heard him yesterday.  We played his testimony

11:30:44   17    for you.  We played it so that you can get the full picture.

11:30:48   18    Remember I said sometimes not all the facts come out until we

11:30:52   19    get to stand up.  He's not our witness.  He's not our expert.

11:30:57   20    He wasn't hired by us.

11:30:58   21          We found the study and we went out and took his

11:31:02   22    deposition, and the plaintiffs asked him a lot of questions.

11:31:04   23    And what he told us is that, when he tested the green end,

11:31:08   24    there was very good attenuation, that the product worked as

11:31:12   25    advertised.  That study is the same WHISPr study that we were

11:31:17  1   talking about.  It's right here.  You'll have it in evidence.

11:31:22  2   You can see it yourself.  Mr. McKinley's own work proved that

11:31:29  3   this product worked.

11:31:31  4        Further evidence that the product worked.  You heard

11:31:37  5   Dr. Casali yesterday.  He talked to you about testing done in

11:31:41  6   an independent lab, in fact, against 3M in a totally different

11:31:50  7   situation tested the product, and again the product worked.  It

11:31:54  8   had an attenuation, the NRR -- there's all this discussion does

11:32:00  9   it meet the noise reduction that is advertised.  And I use the

11:32:05  10  word "advertised" in quotes.

11:32:08  11       What was said the product would attenuate?  Does it

11:32:12  12  satisfy a 22?  Here is a test right here objectively done.  Mr.

11:32:18  13  McKinley didn't even mention this.  Its attenuation was a 23.

11:32:25  14  Whether it's a 22 or a 23 or a 21 is not a issue.  It is

11:32:31  15  objective evidence that this product did exactly what 3M and

11:32:36  16  Aearo said it would do -- it would fit many and it would

11:32:41  17  attenuate to a certain level.

11:32:43  18       Now, what did we not say it would do?  Recall

11:32:48  19  yesterday when Dr. Casali was here.  I see we took the pages

11:32:57  20  down.  So, if you recall, I started my discussion with him at

11:33:03  21  one point, and I said let's talk about the difference between

11:33:06  22  protect and prevent.  Because there is a difference.

11:33:12  23       Protecting means exactly that, it helps reduce the

11:33:17  24  risk.  That's what the ANSI standards says.  That's what the

11:33:24  25  community that works -- that professionals and the experts that

12:44:42   1   only a couple of weeks ago, I would ask you to stay long enough

12:44:45   2   to help Ms. Simms gather up all the evidence.  We don't have to

12:44:50   3   do that, so that's terrific.

12:44:53   4          I would ask that you stay here in the courthouse for

12:44:55   5   the next ten minutes or so just to see if there is a question

12:44:58   6   or anything, communication that the jury has right off the bat.

12:45:03   7   I doubt it because their lunch, I believe, is here.  But it's

12:45:08   8   my practice to ask that you remain here for about ten minutes,

12:45:12   9   and then be within five minutes or so of a phone call in case

12:45:16   10  we have a communication or a verdict.

12:45:18   11         Any communication that the jury may send out of the

12:45:20   12  jury room, you will be notified, and I will ask at least one of

12:45:24   13  your team to return so that I can address that communication

12:45:28   14  with you.  I don't respond to anything without you all being

12:45:32   15  aware of the communication.

12:45:35   16         Any questions?

12:45:38   17         **MR. OVERHOLTZ:**  No, Your Honor.

12:45:39   18         **THE COURT:**  We'll be in recess awaiting the jury's

12:45:41   19  verdict.

06:14:06   20         *(Recess taken 12:45 p.m. to 6:16 p.m.)*

06:16:19   21         **THE COURT:**  The jury has reached a verdict.

06:16:29   22         So, in just a moment, I'll have them brought into the

06:16:33   23  courtroom and we will publish the verdict here in open court.

06:16:35   24         A word with everyone here in the courtroom.

06:16:37   25  Obviously, this is an adversarial system.  We have two parties.

**A-78**

| | | |
|---|---|---|
| 06:16:43 | 1 | One is likely to be very happy or pleased with the verdict and |
| 06:16:46 | 2 | one is likely to be very disappointed with the verdict.  I have |
| 06:16:50 | 3 | no idea what the verdict is, we never do.  But, again, the |
| 06:16:53 | 4 | adversarial nature of our system tells us likely one side is |
| 06:16:57 | 5 | going to be likely and the other very disappointed.  It's |
| 06:17:01 | 6 | understandable. |
| 06:17:01 | 7 | But I'm going to ask that, regardless of which side |
| 06:17:05 | 8 | you fall on, that there not be any show of emotion in approval |
| 06:17:10 | 9 | of or disapproval of, in favor of or against the jury's |
| 06:17:14 | 10 | verdict, whatever it is.  You need to ask yourself now if you |
| 06:17:17 | 11 | can sit here in the courtroom quietly as the verdict is |
| 06:17:22 | 12 | published.  And if you don't feel that you can do that, then |
| 06:17:25 | 13 | I'm going to ask you to leave the courtroom now, and you |
| 06:17:27 | 14 | certainly can return once the verdict has been received and the |
| 06:17:30 | 15 | jury has left the courtroom. |
| 06:17:31 | 16 | The point of all this is that I don't want these |
| 06:17:34 | 17 | jurors to be made to feel poorly or bad in any way about |
| 06:17:39 | 18 | whatever verdict they have reached.  They are not here |
| 06:17:42 | 19 | voluntarily.  They do the best that they can do with what we |
| 06:17:45 | 20 | give them.  You give them the facts, I give them the law, and |
| 06:17:49 | 21 | they do the best that they can.  And again, I don't want them |
| 06:17:54 | 22 | to feel anything other than good about their service, |
| 06:17:57 | 23 | regardless of the verdict.  So just think about that and your |
| 06:18:00 | 24 | own conscience and decide if you can sit quietly. |
| 06:18:06 | 25 | With that said, Mr. McCombs and Mr. Rucker, you |

| | |
|---|---|
| 06:18:08 | 1 |

couldn't have had better representation. I mean, regardless of
what the verdict is, you couldn't have had better
representation. These lawyers put everything into this trial
and they did an outstanding job, and I just want you both to
know that.

And I appreciate very much -- I know this is a lot of
emotions and a lot of energy that has gone into this trial, and
you can be very proud of the work that you've done -- whether
you're happy with the verdict or not, you should be proud of
the work that they've done and what you've put into the trial.
And I appreciate your professionalism with one another as well
as with the Court.

One other quick question. After the verdict in the
first trial, the jury was asked if they would meet with the
lawyers. They agreed to do so. Given the hour -- I mean, I'm
happy to ask them. I don't know that they will want to. I'm
also happy to just talk to them myself -- I do that after every
trial -- and I can relay to you what they say to me about the
trial.

So are both sides good with just letting the jury go
or do you want me to ask them if they would speak to you?

**MS. KARIS:** Your Honor, if they're willing to speak
with us, we would like opportunity. But we also understand the
time, and it's Friday evening and holiday weekend. But we
would like the opportunity at least to ask them.

**A-80**

06:26:02   1   you back.

06:26:02   2          So, ladies and gentlemen, again, with my thanks and

06:26:06   3   appreciation to you for your service, you'll be dismissed at

06:26:08   4   this time.  You'll be asked to step into the jury room one

06:26:11   5   final time, and then shortly you'll be on your way.  Thank you

06:26:14   6   very much.

06:26:16   7          *(Jury out.)*

06:26:37   8          Like I said, judgment will be entered consistent with

06:26:40   9   the verdict.  I'm going to go in and speak to the jurors, and

06:26:42   10  then I'll let you know if any of them are willing to stay and

06:26:46   11  talk.

06:26:47   12         **MS. KARIS:**  Thank you, Your Honor.

06:26:48   13         **MS. ELIZABETH:**  Thank you, Your Honor.

          14              ***(Proceedings concluded at 6:26 p.m.)***

          15                      --------------------

          16   *I certify that the foregoing is a correct transcript from the*
          17   *record of proceedings in the above-entitled matter.  Any*
               *redaction of personal data identifiers pursuant to the Judicial*
          18   *Conference Policy on Privacy are noted within the transcript.*

          19
               *s/Donna L. Boland*                        *5-28-2021*
          20   *Donna L. Boland, RPR, FCRR*                *Date*
               *Official Court Reporter*
          21

          22

          23

          24

          25

**A-81**

1                                    **INDEX**

2                                                              **PAGE**

3
    Attorney Conference                                          3
4
    Jury Instructions                                           10
5
    CLOSING ARGUMENTS
6       By Mr. Monsour                                          38
        By Mr. Overholtz                                        60
7       By Ms. Karis                                            85
        By Mr. Monsour                                         133
8
    Final Jury Instructions                                    149
9
    Verdict                                                    157
10

11  CERTIFICATE OF REPORTER                                    161

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A-82**

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October, 2021, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

I further certify that on this same day, four paper copies of the foregoing were sent by third party commercial carrier for delivery within 3 days and properly addressed to the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit at the following address:

Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Dated:  October 28, 2021          /s/ *Kevin S. Rosen*

_____

Kevin S. Rosen
*Attorney for Appellants*